**UNION PACIFIC RAILROAD COMPANY, Petitioner,**

v.

**AUDITING DIVISION OF THE UTAH STATE TAX COMMISSION, Respondent.**

**No. 910150.**

Supreme Court of Utah.

Nov. 6, 1992.

---

Robert A. Peterson, Salt Lake City, for Union Pacific.

R. Paul Van Dam, Rick Carlton, Salt Lake City, for Tax Com'n.

DURHAM, Justice:

In proceedings before the Utah State Tax Commission, Union Pacific Railroad Company sought relief from a sales and use tax deficiency order imposed against it by the Auditing Division of the Commission. After a formal hearing, the Commission determined that (1) Union Pacific owed sales and use tax on its in-state purchases of diesel fuel and ballast [1] even though Union Pacific transported the materials for its own use outside of Utah; (2) Union Pacific owed sales and use tax on certain services performed in Oregon on cross ties (commonly known as railroad ties) it owned; and (3) in the future, the Commission may assess a sales tax on the full cost of repair services Union Pacific performs on the railcars of other carriers. Union Pacific now seeks review of these determinations. It also challenges the Auditing Division's imposition of a penalty on the deficiency. We affirm the first determination, reverse the second, and decline to review the third. We also vacate the imposition of the penalty and remand the issue for further review by the Commission.

Because the issues have different factual backgrounds and standards of review, we set forth the facts and standard of review separately for each issue.

I. TAXABILITY OF IN–STATE PURCHASES OF BALLAST AND FUEL USED OUTSIDE UTAH

Union Pacific, through its fuel division located in Omaha, Nebraska, arranged to purchase diesel fuel from Amoco's Salt Lake City operation. Amoco loaded the fuel into Union Pacific tank cars and turned them over to Union Pacific at the

1. Gravel or broken stone laid in a railroad bed.

railhead. Amoco's sales invoice specifies that Amoco delivered the fuel f.o.b. at Amoco's Salt Lake City operation and that a common carrier shipped the fuel. Union Pacific produced "waybill"[2] summaries indicating the destination of each tank car of fuel.

Union Pacific also generated waybills showing the destination of each railcar load of ballast purchased from three Utah vendors. The vendors, MONROC, RME, and UP Resources, loaded the ballast into Union Pacific railcars, and Union Pacific then transported the ballast to its ultimate destination. One sales invoice for the purchase of ballast between MONROC and Union Pacific states, "It is hereby agreed that sale is consummated & title passes at plant site." The record does not include invoices or purchase agreements between RME or UP Resources and Union Pacific.

Union Pacific did not pay sales tax on the portion of ballast it transported for its own use outside Utah on purchases from two of the three Utah ballast vendors. Nor did Union Pacific pay sales tax on the portion of the in-state diesel fuel purchases that it transported for its own use outside Utah. The Commission upheld a deficiency order against Union Pacific for sales and use taxes on these purchases. Union Pacific claims that the Commission's rules on interstate sales exempt these purchases. *See* Utah Admin.R. 865–19–44S.

Section 16 of the Utah Administrative Procedures Act (UAPA) governs the standard of review in this matter. Utah Code Ann. § 63–46b–16. Because Union Pacific claims that the Commission's decision does not comport with the Commission's interstate sales rule, possible grounds for relief include section 63–46b–16, subsections 4(a) and 4(h)(ii). Section 63–46b–16(4)(a) provides for judicial relief if the "rule on which [an] agency action is based[ ] is unconstitutional on its face or as applied." Subsection (4)(h)(ii) provides for judicial relief if agency action is "contrary to a rule of the agency." Union Pacific did not challenge the constitutionality of the Commission's rule or its application. We therefore conclude that Union Pacific bases this claim on subsection (4)(h)(ii).

■ Section 63–46b–16(4)(h)(ii) refers to rules promulgated by the agency itself. Because courts should uphold agency rules if they are reasonable and rational, *see Williams v. Public Serv. Comm'n,* 754 P.2d 41 (Utah 1988), courts should also uphold reasonable and rational departures from those rules absent a showing that the departure violated some other right. We will thus employ an intermediate standard (one of some, but not total, deference) in reviewing Union Pacific's claim that the Commission erred in applying its rules.

Union Pacific argues that the Commission's decision to assess sales tax on Union Pacific's purchases of fuel and ballast transported for Union Pacific's use outside of Utah does not comport with the Commission's rule on interstate commerce, codified at Utah Admin.R. 865–19–44S (rule 44S). The rule reads as follows:

A. Sales made in interstate commerce are not subject to the sales tax imposed. However, the mere fact that commodities purchased in Utah are transported beyond its boundaries is not enough to constitute the transaction of a sale in interstate commerce. When the commodity is delivered to the buyer in this state, even though the buyer is not a resident of the state and intends to transport the property to a point outside the state, the sale is not in interstate commerce and is subject to tax.

B. Before a sale qualifies as a sale made in interstate commerce, the following must be complied with:

1. the transaction must involve actual and physical movement of the property sold across the state line;

2. such movement must be an essential and not an incidental part of the sale;

3. the seller must be obligated by the express or unavoidable implied terms of the sale, or contract to sell, to make

---

2. The record indicates that a waybill is a document generated internally by Union Pacific to direct the route of freight cars and is distinguishable from a bill of lading, which is a contractual document with the vendor.

physical delivery of the property across a state boundary line to the buyer[.]

C. Where delivery is made by the seller to a common carrier for transportation to the buyer outside the state of Utah, the common carrier is deemed to be the agent of the vendor for the purposes of this section regardless of who is responsible for the payment of the freight charges.

Subsection A makes clear that the mere fact that Union Pacific transported the fuel and ballast out of Utah does not qualify the purchases for the interstate sales exemption. Therefore, Union Pacific must look to subsections B and C to exempt the fuel and ballast purchases.

■ Subsection B imposes three requirements that Union Pacific must meet to qualify for the exemption. Without examining the first two requirements, we conclude that Union Pacific did not qualify for the interstate sales exemption under subsection B(3) because the fuel and ballast vendors were not obligated to deliver Union Pacific's purchases outside Utah. Amoco's sales invoice for the purchase of fuel specified that Amoco delivered the fuel f.o.b. to Amoco's Salt Lake City operation. The sales invoice for the purchase of ballast from MONROC indicated that title to the ballast passed at MONROC's pit in Utah. Moreover, the record did not contain evidence of any contractual obligation of Amoco, MONROC, RME, or UP Resources to deliver Union Pacific's purchases across the state boundary.[3] In short, the evidence supports the conclusion that physical delivery occurred in Utah when the vendors loaded the fuel and ballast on Union Pacific's cars and that the vendors had no obligation to deliver the fuel or ballast out of state. We therefore hold that the Commission made a rational and reasonable determination that Union Pacific did not qualify for the interstate sales exemption under subsection B.

■ Subsection C presents the question of whether Union Pacific should qualify for the exemption because of its status as a common carrier. All railroad companies are common carriers under the Utah Constitution. Utah Const. art. XII, § 12. Union Pacific argues that because subsection C treats a common carrier as "the agent of the vendor," when a common carrier delivers material out of Utah it is the equivalent of the vendor's making direct delivery to the out-of-state purchaser. The Commission rejected this contention, holding that Union Pacific took delivery of the fuel and ballast in the capacity of purchaser and consumer and not in the capacity of common carrier.

Both Union Pacific and the Commission offer plausible constructions of subsection C of the interstate sales exemption rule. Although our conclusion might be different under a correction-of-error standard, we conclude that the Commission made a reasonable and rational decision. Subsection C seems to contemplate a common carrier other than the buyer. The rule speaks of delivery to "a common carrier for transportation to the buyer." If the common carrier is the buyer, there is no need for transportation to the buyer and the rule does not apply. Furthermore, while courts should generally construe taxing statutes favorably to the taxpayer and strictly against the taxing authority, "the reverse is true of exemptions." *Parson Asphalt Prods., Inc. v. State Tax Comm'n*, 617 P.2d 397, 398 (Utah 1980). We therefore affirm the Commission's ruling on this question.

## II. TAXABILITY OF CROSS TIES

In order to meet its cross tie (railroad tie) needs, Union Pacific purchased raw logs from various places and shipped them to an independent tie treating plant in Oregon. The plant treated the ties with creosote, drilled holes for spikes, and milled the ties

---

**3.** Union Pacific points to internally generated waybill documents that direct the route of freight cars to substantiate its claim that rule 44S exempts the ballast and diesel fuel purchases transported for Union Pacific's use outside Utah. Waybills, however, are not negotiated between the vendor and the purchaser and do not obligate the vendor "by the express or unavoidable implied terms of the sale, or contract to sell" to make physical delivery of the property across a state boundary. Utah Admin.R. 865–19–44S(B)(3).

to ensure uniform size. After the treating plant completed this work, Union Pacific transported the ties to Utah and installed them there. Union Pacific then paid sales and use tax on them based only on the cost of the raw logs plus the cost of the creosote treatment. The Commission upheld a deficiency order requiring Union Pacific to include the cost of the drilling and milling in the amount taxed on the cross ties. The Commission concluded that "the cost[s] involved in creating the installed products, such as milling costs, represent services rendered in the repair or renovation of tangible personal property and are taxable," relying on Utah Code Ann. § 59–12–103(1)(g),[4] and also concluded that "[i]t is the addition of those costs into the total cost of the cross ties that truly represent[s] the taxable value of the ties." Union Pacific argues that the drilling and milling services do not fit the categories of taxable services contemplated by the statute. Union Pacific further contends that Utah's imposition of a sales tax on services performed in another state unconstitutionally interferes with interstate commerce.

■ We review Union Pacific's constitutional claims under section 63–46b–16(4)(a). Subsection 4(a) provides that an appellate court may grant relief if "the agency action, or the statute or rule on which the agency action is based, is unconstitutional on its face or as applied." We will apply a no-deference correction-of-error standard to review claims of unconstitutional agency action under this section. *Questar Pipeline Co. v. State Tax Comm'n,* 817 P.2d 316, 317–18 (Utah 1991). Regarding the statutory construction issue, to the extent the legislature delegated to the Commission discretion to interpret the sales tax statute, we will review the Commission's construction under a reasonableness-and-rationality standard; otherwise, we will apply a correction-of-error review to issues of statutory construction. *See Morton Int'l,* *Inc. v. Auditing Div.,* 814 P.2d 581, 587–89 (Utah 1991).

### A. Use Tax Based on Services Performed Out of State

■ Union Pacific claims that Utah oversteps the constitutional boundaries drawn by the commerce clause by levying a sales tax on services rendered in Oregon. In order to analyze this claim, we must first examine the Utah Sales and Use Tax Act (the Act) and distinguish between the sales tax component and the use tax component of the Act. The Commission's rules differentiate the two:

A. The sales tax is imposed upon sales of tangible personal property made within the state of Utah, regardless of where such property is intended to be used, and on the amount paid or charged for all services for repairs and renovations of tangible personal property or for installation of tangible personal property rendered in connection with other tangible personal property.

B. The use tax is imposed upon the use, storage or other consumption of tangible personal property, and upon the amount paid or charged for the services for repairs or renovations of tangible personal property or installation of tangible personal property in connection with other tangible personal property, if the tangible personal property is for use, storage, or consumption in Utah; and, ordinarily, if the transaction does not take place within the state of Utah.

C. The two taxes are compensating taxes, one supplementing the other, but both cannot be applicable to the same transaction. The rate of tax is the same.

D. The distinguishing factor in determining which tax is applicable is normally the place where the sale or service takes place. If the sale is made in Utah, the sales tax applies. If the sale is made elsewhere, the use tax applies.

---

**4.** Section 59–12–103(1)(g) states:

(1) There is levied a tax on the purchaser for the amount paid or charged for the following:

...;

(g) services for repairs or renovations of tangible personal property or services to install tangible personal property in connection with other tangible personal property[.]

Utah Admin.R. 865–19–1S. To recapitulate, the sales tax imposes a transaction tax on certain sales and certain services that occur in Utah. Complementing the sales tax, the use tax imposes an excise tax on tangible property and certain services performed in connection with that property, where the property is stored or used in Utah but is not subject to Utah sales tax because it was purchased or the service was performed outside of Utah. *See Barrett Inv. Co. v. State Tax Comm'n*, 387 P.2d 998, 999 (Utah 1964).

If the owner of property used in Utah paid sales or use tax in another state, that tax is credited to offset the use tax levied in Utah.[5] Because of the use tax, items used in Utah but purchased elsewhere share the same tax burden as those items purchased in Utah. The use tax, therefore, helps Utah merchants compete on equal terms with merchants in other states by removing the incentive for purchasers to search for states with lower sales tax in which to purchase items for use in Utah. *See id.; Henneford v. Silas Mason Co.*, 300 U.S. 577, 581, 57 S.Ct. 524, 526, 81 L.Ed. 814 (1937) (*Silas Mason*); Paul J. Hartman, *Federal Limitations on State and Local Taxation* § 10:7 (1981).

Union Pacific claims that Utah violated the commerce clause by levying a sales tax on services rendered in Oregon. In so claiming, Union Pacific misapprehends the nature of the tax imposed and how it relates to the commerce clause. Utah levied a use tax, not a sales tax. Utah did not levy a tax on the sale of the raw logs and the services performed out of state; instead, Utah taxed Union Pacific's use of cross ties within the state.

For over fifty years, the United States Supreme Court has upheld the nondiscriminatory application of a tax on the use of property that has come to rest in a state. *See, e.g., Silas Mason; Wiloil Corp. v. Pennsylvania*, 294 U.S. 169, 55 S.Ct. 358, 79 L.Ed. 838 (1935). In *Silas Mason*, contractors working on Grand Coulee Dam on the Columbia River objected to the state of Washington's imposition of a use tax. Washington taxed equipment the contractors used in Washington but had purchased out of state. The Washington tax scheme levied a "tax or excise for the privilege of using within this state any article of tangible personal property," including the cost of transportation from the place of purchase. 300 U.S. at 580. The tax scheme also provided credit against the use tax for sales or use tax paid in Washington or in some other state.

Writing for the Court, Justice Cardozo noted that items obtained through interstate commerce do not necessarily remain in interstate commerce. Furthermore, he recognized that because states can levy a tax on property within the state, they can levy a tax on the use or enjoyment of property:

> The tax is not upon the operations of interstate commerce, but upon the privilege of use after commerce is at an end.

> Things acquired or transported in interstate commerce may be subjected to a property tax, non-discriminatory in its operation, when they have become part of the common mass of property within the state of destination.... For like reasons they may be subjected, when once they are at rest, to a non-discriminatory tax upon use or enjoyment.

*Id.* 300 U.S. at 582, 57 S.Ct. at 526.

Hence, the commerce clause permits a state to tax property which has "become part of the common mass of property within the state." Moreover, it does not prohibit the state from including the price of services performed in the manufacture of tangible property in calculating the basis for the use tax levy. This is implicit in the nature of tangible personal property. Both raw materials and the services performed in transforming those raw materials into a finished article contribute to the value of an item of tangible property. Consequently, when a state bases a use tax on

---

**5.** Utah Code Ann. § 59–12–104(28) exempts from sales and use tax "property upon which a sales or use tax was paid to some other state, or one of its subdivisions, except that the state shall be paid any difference between the tax paid and the tax imposed by [the Act] and no adjustment is allowed if the tax paid was greater than the tax imposed by [the Act]."

the selling price of an item of tangible property, the basis necessarily includes the cost of services because the seller incorporates the cost of the services into the selling price. The Court in *Silas Mason*, for example, upheld the Washington tax, which based the use tax on the total retail price of the construction equipment, not merely on the price of the unassembled component parts of the equipment. *Id.* at 579, 57 S.Ct. at 525.

■■■ A state may also include the cost of services performed in connection with tangible personal property that the taxpayer already owns in calculating the basis for the use tax. The basis of the Washington tax approved in *Silas Mason* included the service of transporting goods already owned by the taxpayer. *Id.* at 580, 57 S.Ct. at 525. In *Halliburton Oil Well Cementing Co. v. Reily*, 373 U.S. 64, 83 S.Ct. 1201, 10 L.Ed.2d 202 (1963), the Court again considered a state use tax that included the cost of services in the basis for calculating the tax. *Halliburton* involved a use tax levied by the state of Louisiana that included the out-of-state costs of labor and shop overhead incurred in the manufacture of specialized equipment. The taxpayer manufactured oil well cementing trucks and electrical well logging trucks in Oklahoma, some of which the taxpayer used in Louisiana. *Id.* at 66, 83 S.Ct. at 1202. In examining the Louisiana use tax, the *Halliburton* Court did not object to inclusion of labor costs the taxpayer incurred in Oklahoma in the basis for calculating the Louisiana use tax.[6] We therefore hold that including the costs of services performed in Oregon in the basis of the Utah use tax imposed on Union Pacific's cross ties does not in itself impose a burden on interstate commerce.

### B. *Discrimination Against Interstate Commerce*

■■■ Although the state may include the price of services performed in connec-

tion with tangible property in calculating the basis for a use tax, it cannot impose a tax which discriminates against interstate commerce. The *Halliburton* Court stated that "equal treatment for in-state and out-of-state taxpayers similarly situated is the condition precedent for a valid use tax on goods imported from out-of-state." *Id.* at 70, 83 S.Ct. at 1204. The following facts stipulated by the parties in *Halliburton* demonstrate the discriminatory impact of the Louisiana tax:

> If Halliburton had purchased its materials, operated its shops, and incurred its Labor and Shop Overhead expenses at a location within the State of Louisiana, there would have been a sales tax due to the State of Louisiana upon the cost of materials purchased in Louisiana and a Use Tax on materials purchased outside of Louisiana; but there would have been no Louisiana sales tax or use tax due upon the Labor and Shop Overhead.

*Id.* at 67, 83 S.Ct. at 1202. In order for the state to include out-of-state services in the basis for calculating the use tax, the Constitution requires that those services be taxable if performed within the state.

■■■ If applied correctly, the Utah Sales and Use Tax Act does not discriminate against interstate commerce. The Commission's rules provide, "The use tax is a complement to the sales tax and the rules promulgated, when applicable, are common to both taxes." Utah Admin.R. 865–21–2U; *see Barrett Inv. Co. v. State Tax Comm'n*, 15 Utah 2d 97, 387 P.2d 998, 999 (1964) (sales and use tax acts are correlative and complementary to each other). Moreover, courts should construe statutes so that they conform to constitutional mandates. Therefore, in reviewing the construction and application of the Act, this court will uphold the imposition of a use tax on tangible property imported from out of state only if the state could have taxed the in-

---

**6.** The Court, however, ultimately struck down the Louisiana use tax. An in-state manufacturer of the same item would not have been taxed on the labor and overhead costs. Because the out-of-state manufacturer faced a higher tax bur-

den, the Court held that the scheme discriminated against interstate commerce. *Id.* 373 U.S. at 75, 83 S.Ct. at 1206. See the discussion in the next section.

volved transactions if they had occurred within the state.[7]

### C. Application of the Utah Sales and Use Tax Act

Union Pacific purchased raw logs from various vendors located outside Utah and paid sales taxes on these purchases. After acquiring title, the railroad shipped these logs to an independent contractor in Oregon for creosote treatment and milling and drilling services in preparation for their use as cross ties. The railroad held title to the ties at all times after the initial purchase of the raw logs.[8] Union Pacific paid use tax based on the cost of the raw logs plus the creosote treatment. However, Union Pacific did not include the cost of drilling and milling services in calculating the basis of the use tax.

The Act permits the state to tax "retail sales of tangible personal property made within the state," certain enumerated services rendered within the state, and in-state storage, use, or consumption of tangible property purchased outside the state. Utah Code Ann. § 59–12–103. The basis for the taxation of personal property and certain services rendered in connection therewith is calculated on the "amount paid or charged" for the sale or service. *Id.* The use tax, as discussed in section A above, mirrors the sales tax in its application. Accordingly, the use tax should also be based on the amount paid for the raw logs and the amount paid for those services that are taxable under the terms of the statute. The only provisions that could conceivably apply to the milling and drilling services performed on the cross ties are the following:

(g) services for repairs or renovations of tangible personal property or services to install tangible personal property in connection with other tangible personal property;

(h) cleaning or washing of tangible personal property.

Utah Code Ann. § 59–12–103.

Union Pacific argues that drilling and milling are not the same as washing, cleaning, repairing, or renovating. The Commission found that

the cost[s] involved in creating the installed products, such as milling costs, represent services rendered in the repair or renovation of tangible personal property and are taxable. It is the addition of those costs to the total cost of the cross ties that truly represent[s] the taxable value of the ties.

The notion of "taxable value" applied by the Commission implies that the Commission included the amount paid for the services performed on the ties because those services added to the value of the ties. The "value" of the ties, however, is not the proper basis for calculating use tax. The basis for calculating use tax in the instant case is the amount paid for the raw logs when purchased plus the amount paid for services that fall into one of the specified categories of taxable services.

The Commission has attempted to classify the milling and drilling services as repairs or renovations. Because we conclude that the Commission has discretion to interpret the terms "repairs" and "renovations," we review the Commission action for reasonableness and rationality. Utah Administrative Rule 865–19–78S (rule 78S),

---

**7.** Union Pacific also claims that Utah's use tax discriminates against interstate commerce by subjecting Union Pacific to double taxation. We summarily dismiss this contention by pointing to Utah Code Ann. § 59–12–104(28), which exempts from sales and use tax

> property upon which a sales or use tax was paid to some other state, or one of its subdivisions, except that the state shall be paid any difference between the tax paid and the tax imposed by [the Act,] and no adjustment is allowed if the tax paid was greater than the tax imposed by [the Act].

This exemption ensures that the state will not subject out-of-state sales and services to double taxation.

**8.** These facts distinguish the instant case from our recent case of *BJ–Titan Services v. State Tax Commission*, 183 Utah Adv.Rep. 20 (March 31, 1992), in which we upheld imposition of sales tax on the cost of services performed *incidental to and as part of* the actual sale of tangible personal property. *Id.* at 24. The services at issue in this case all occurred independently from and well after the sale of the property itself.

guides the taxation of services pursuant to Utah Code Ann. § 59–12–103:

> A. Persons who wash, clean, repair, or renovate tangible personal property, whether material is furnished by the seller or not, are required to collect the sales tax upon the total charge made for the rendition of such services.
>
> B. Amounts paid or charged for installing tangible personal property in connection with other tangible personal property are subject to tax.

The Commission found that the categories of taxable services contained in rule 78S provide for the taxation of the creosote treatment and the drilling and milling services. The creosote treatment involved applying tangible personal property, the creosote, to other tangible personal property, the cross ties. The creosote treatment is thus taxable.[9] *See BJ–Titan Servs. v. State Tax Comm'n*, 842 P.2d 822 (Utah 1992).

■ Rule 78S, however, does not support taxing the drilling and milling services on logs Union Pacific had previously purchased. Milling logs into uniform size and drilling spike holes do not involve the installation of tangible personal property. Furthermore, drilling and milling do not suggest the same type of activity as washing or cleaning. The Commission appears to view drilling and milling as equivalent to repair or renovation. Repair and renovation, however, suggest activities that "fix"

an already manufactured product. To repair is to "restore by replacing a part or putting together what is torn or broken." To renovate is to "restore to a former better state." *Webster's Ninth New Collegiate Dictionary* 998 (1984). Drilling and milling the cross ties did not involve repairing existing cross ties or restoring the existing cross ties to a former better state.[10] Thus, even under a deferential standard of review, we agree with Union Pacific that the drilling and milling services are not repairs or renovations within the meaning of section 59–12–103(1)(g). We note that the witness for the Auditing Division admitted as much at the hearing before the Tax Commission, and this admission went uncontested.

The proper focus is not on what Union Pacific "imported" into this state, i.e., finished railroad ties, but rather on the transactions that actually took place, whether inside or outside Utah, and the taxability of each transaction. The Commission erroneously adopted the former approach in concluding that the drilling and milling services were taxable because they contributed to the "taxable value" of the ties. Union Pacific separately purchased raw logs, drilling and milling services, and creosoting services. Union Pacific paid taxes on the purchase of raw logs and the purchase of creosoting services. But none of the provisions in the Sales and Use Tax Act permit the taxation of the drilling and milling ser-

---

**9.** Union Pacific does not dispute this. In fact, as mentioned above, Union Pacific paid taxes on these services.

**10.** Rule 865–19–51S of the Utah Administrative Code (rule 51S) supports the conclusion that services performed in the creation of a newly manufactured product are not the same as the repair or renovation of an already manufactured product. Rule 51S provides:

> A. The amount charged for fabrication or installation which is part of the process of creating a finished article of tangible personal property must be included in the amount upon which tax is collected. *This type of labor and service charge may not be deducted from the selling price used for taxation purposes even though billed separately to the consumer* and regardless of whether the articles are commonly carried in stock or made up on special order.

> B. Casting, forging, cutting, drilling, heat treating, surfacing, machining, constructing, and assembling are examples of steps in the process resulting in the creation or production of a finished article.

(Emphasis added.)

Rule 51S underscores that the cost of services performed prior to the sale of an item of tangible personal property must be included in the amount paid for the item for sales tax purposes. The rule includes an extensive list that illustrates some of the types of services taxable in the sale of a finished item of tangible personal property. Services performed on items owned by the taxpayer, however, may only be taxed under rule 78S. Moreover, rule 78S's omission of an extensive list similar to the list found in rule 51S indicates that authority to tax services performed on items owned by the taxpayer is not coextensive with the authority to tax based on services performed prior to sale.

vices when performed independently from the sale of the ties themselves. We therefore hold that the Commission erred in requiring Union Pacific to pay use tax for the amount paid for these services.

### III. TAXABILITY OF AAR CAR REPAIRS

Federal law requires Union Pacific to inspect for safety defects all freight cars received from other railroads that travel on Union Pacific's lines. Pursuant to rules promulgated by the American Association of Railroads (AAR), Union Pacific repairs safety defects on freight cars and charges the railroad owning the defective freight car for services and materials. According to a formula created in an audit prior to 1959, Union Pacific charged and collected sales tax on only 9.82 percent of the total repair bill for AAR repairs it performed in Utah.

The rationale behind the formula is that since Union Pacific had already paid sales or use tax on the repair materials stored in its warehouse, the taxing authority needed to adjust the amount of tax charged for repairs using those materials. The Auditing Division has audited Union Pacific several times since 1959 and has not instructed Union Pacific to discontinue the practice of collecting sales tax on only a fraction of the total AAR repair bill. In this most recent audit, however, the Auditing Division issued a sales tax deficiency assessment against Union Pacific, claiming that Union Pacific's use of the 9.82 percent formula was incorrect and that Union Pacific owed sales tax on the entire amount of the AAR repairs.

On review, the Commission agreed with the Auditing Division that the 9.82 percent formula was incorrect and that Union Pacific should have collected sales tax on the full amount of AAR repairs. The Commission, however, overturned the tax deficiency assessed by the Auditing Division. Because the use of the formula was a longstanding practice left uncorrected by several audits, the Commission reasoned that imposing taxes for prior periods would constitute retroactive law making. Therefore, without assessing a deficiency, the Commission ordered Union Pacific to collect tax on the total bill for AAR repairs beginning five days after the date of the Commission's decision. Union Pacific seeks relief from the prospective compliance required by the Commission's decision.

We decline to address this aspect of the Commission's order because the Commission has not yet audited or assessed a tax deficiency against Union Pacific in this matter, but has determined only that one hundred percent of the charge for the AAR repairs will be taxable in the future. Union Pacific does not appear to contest the abstract proposition that services and materials furnished in AAR repairs are taxable, but contends instead that it is entitled to "credits or deductions" against this tax liability to reflect taxes it has previously paid on materials for repairs. The Tax Commission, however, should determine in the first instance whether Union Pacific can validly claim to have satisfied a specific portion of its sales tax liability for AAR repair charges or in the alternative whether Union Pacific's initial purchases of inventory for use in repairs should be tax exempt. The parties themselves have not squarely confronted this issue in the proceedings below or in their briefs, and the practical effect of the Commission's order is not yet clear. Union Pacific's implicit suggestion that the Commission's order creates an abuse of the state's power to tax is purely hypothetical. Accordingly, we conclude that it would be inappropriate for us to treat this issue at this time.

### IV. PENALTY ASSESSMENT

The Auditing Division imposed a penalty on the deficiency assessment. Union Pacific did not contest the penalty before the Commission but does so before this court. The Commission may assess a penalty for negligent, intentional, or fraudulent underpayment of tax. Utah Code Ann. § 59–1–401(3). In applying the penalty, the Auditing Division and the Commission should not mechanically assess a penalty in every case of underpayment. Instead, they should determine in each case whether the taxpayer

negligently, intentionally, or fraudulently underpaid. Because Union Pacific did not raise the issue before the Commission, we have no basis in the record upon which to review the imposition of the penalty. It does not appear, however, that either the Auditing Division or the Commission has made the finding of negligence, intentional disregard, or fraud necessary to justify a penalty under section 59–1–401(3). Because we are remanding this matter for other proceedings, we vacate the imposition of the penalty and remand this issue for reconsideration by the Commission and specific findings and conclusions regarding a penalty.

## V. CONCLUSION

We affirm the Commission's decision to assess sales tax on Union Pacific's purchases of fuel and ballast transported for Union Pacific's use outside Utah. We reverse the Commission's decision to assess use tax on the drilling and milling costs paid by Union Pacific. We decline to address the Commission's conclusion that Union Pacific will henceforth be required to collect sales tax on the full amount of repairs made on other railroads' freight cars under AAR regulations. Finally, we vacate the Commission's decision to impose a penalty on the tax deficiency and remand the issue for a determination of whether Union Pacific's underpayment was negligent, intentional, or fraudulent.

HALL, C.J., HOWE, Associate C.J., and STEWART and ZIMMERMAN, JJ., concur.