2003 SD 68

WESTERN WIRELESS CORPORA-
TION, License No. 73–001–
911638901E–ST–001,

and

Sioux Falls Cellular Communications
Corporation, License No. 51–001–
133413748E–ST–001, Plaintiffs and Ap-
pellants,

v.

DEPARTMENT OF REVENUE,
Defendant and Appellee.

No. 22373.

Supreme Court of South Dakota.

Argued on Nov. 19, 2002.

Reassigned March 4, 2003.

Decided June 4, 2003.

Rehearing Denied July 11, 2003.

Steven W. Sanford of Cadwell, Sanford, Deibert & Garry, LLP, Sioux Falls, South Dakota, Attorneys for plaintiffs and appellants.

Lawrence E. Long, Attorney General, Jack C. Magee, Assistant Attorney General, Department of Revenue, Pierre, South Dakota, Attorneys for defendant and appellee.

KONENKAMP, Justice (on reassignment).

[¶ 1.] South Dakota imposes a use tax on tangible personal property and services purchased out of state for in-state use. The question here is whether the Department of Revenue properly levied use tax on out-of-state billing services purchased by a South Dakota cellular phone company to bill and collect fees from its South Dakota subscribers. Both the hearing examiner and the circuit court concluded that the use tax was properly collectible. Because this billing service applies to activities of the purchaser in this state and the amount of tax is apportioned to the billing service applicable to South Dakota customers, our statutes authorize use tax on this service and they are constitutional. We affirm.

### A.

### Background

[¶ 2.] Western Wireless operates a cellular telephone business in South Dakota. Although its principal office is in the State of Washington, it has physical facilities in both Sioux Falls and Rapid City. To provide its South Dakota customers a monthly billing statement for cellular services, Western contracts with Computer Sciences Corporation (CSC) in Champaign, Illinois, to obtain "subscriber billing services." For these services, Western pays an undisclosed fee.[1] Western records the cellular activity of its South Dakota customers on its equipment in South Dakota. Western then sends the recorded information to CSC in Illinois. Using its proprietary software, CSC runs the raw data on these tapes through a "call rating process" to generate electronic bills.

[¶ 3.] The electronic bills are then sent to a Western office in Washington for approval. Once approved, CSC sends them to a subcontractor in California, where invoices are printed. The invoices are placed in the United States mail in California, eventually reaching Western's South Dakota customers. All payments made on bills are remitted to Phoenix, Arizona. Customer questions about the bills are handled in Washington or New Mexico.

---

1. Western declined the Department's request for information to determine what Western pays for this service. Therefore, the Department obtained outside information to calculate the per customer rate for the billing service.

In short, the essential information necessary to complete the bills originates from Western Wireless in South Dakota, and, after processing by the billing service contractor, the bills are mailed to South Dakota subscribers.

[¶ 4.] Upon a tax audit of Western's operations, the Department sought to collect $232,408.12 for use tax on the billing services applicable to Western's billings in South Dakota from 1994 to 1997. Western challenged the assessment. The hearing examiner ruled that the tax was proper. On appeal to the circuit court, it initially reversed the decision. Later, following a remand for further evidentiary findings, the court ruled that the billing services were subject to use tax and that the imposition of the tax was constitutional. On appeal before us, Western asserts that South Dakota's legislative framework does not impose use tax on the billing services and that if it did, such tax would be unconstitutional.[2]

## B.

### Standard of Review

■ [¶ 5.] This is an administrative appeal. We reconfirmed the proper standard of review for administrative appeals in *Sopko v. C & R Transfer Co., Inc.*, 1998 SD 8, ¶¶ 6–7, 575 N.W.2d 225, 228–29. SDCL 1–26–36 requires us to give great weight to administrative findings and inferences on factual questions. *Id.* ¶ 6. Agency findings are examined "in the same manner as the circuit court to decide whether they were clearly erroneous in light of all the evidence. If after careful review of the entire record we are definitely and firmly convinced a mistake has been committed, only then will we reverse." *Id.*

An agency's conclusions of law, however, are fully reviewable. *Id.* Tax statutes are construed liberally in favor of the taxpayer, as are ambiguities in those statutes. *Nash Finch Co. v. South Dakota Dep't of Revenue*, 312 N.W.2d 470, 472 (S.D.1981). Because the questions here are primarily legal ones, our review in this case is de novo.

## C.

### Use Tax on Out–of–State Billing Services

■ [¶ 6.] Sales tax is a transaction tax on certain sales and services occurring in South Dakota. Use tax serves as a sales tax substitute imposed on those who buy out of state and do not pay sales tax. The levy of the use tax attaches after the use of a tangible item or service occurs in South Dakota. *See generally Billings v. United States*, 232 U.S. 261, 34 S.Ct. 421, 58 L.Ed. 596 (1914). The two taxes are mutually compensating, one supplementing the other, but both cannot be equally applicable to the same transaction. The rate of tax is the same. *See generally* SDCL ch 10–45, 10–46.

[¶ 7.] Use taxes accommodate two vital concerns: (1) the state may lose tax revenue if taxpayers purchase out-of-state goods or services for in-state use, and (2) local providers will lose business if taxpayers purchase out-of-state goods or services to avoid sales tax liability. *Northwestern Nat'l Bank of Sioux Falls v. Gillis*, 82 S.D. 457, 467, 148 N.W.2d 293, 298 (1967); *see generally* Jerome R. Hellerstein & Walter Hellerstein, 2 State Taxation § 16.01[2] (3d ed 2000). Thus, the Legislature imposes a sales tax on purchases of goods and services within the state and a comple-

---

**2.** The audit also resulted in additional use tax on certain equipment owned by Western. Western did not dispute that tax.

mentary use tax on goods and services purchased outside the state for use within the state. By itself, a use tax may appear to be discriminatory because it applies only to goods and services acquired out of state. *Halliburton Oil Well Cementing Co. v. Reily*, 373 U.S. 64, 69, 83 S.Ct. 1201, 1203, 10 L.Ed.2d 202 (1963). Nonetheless, because use taxes are paired with complementary sales taxes, the United States Supreme Court has upheld them: in the context of the overall tax structure, such statutes may properly impose on the out-of-state purchase of goods an equivalent burden to that imposed on an in-state purchase. *Henneford v. Silas Mason Co.*, 300 U.S. 577, 57 S.Ct. 524, 81 L.Ed. 814 (1937).

[¶ 8.] To support imposing use tax on the billing services Western purchases, the Department relies on SDCL 10–46–1(13) and 10–46–2.1 (use tax on services).[3] Under SDCL 10–46–1(13), the term "use" "also includes the use of the types of services, the gross receipts from the sale of which are to be included in the measure of the tax imposed by chapter 10–45...." Turning to chapter 10–45, we see that the term "service" means "all activities engaged in for other persons for a fee, retainer, commission, or other monetary charge, which activities involve predominantly the performance of a service as distinguished from selling property." SDCL 10–45–4.1.

[¶ 9.] Western contends that no use tax is payable because of our decision in *Modern Merchandising, Inc. v. Department of Revenue*, 397 N.W.2d 470, 471 (S.D.1986). In that case, this Court reversed the imposition of use tax on the cost of LaBelle's catalogs and flyers mailed to South Dakota residents. LaBelle's sold goods by mail order and through its local stores. The materials were delivered to South Dakota by mail or by common carrier. They were sent by out-of-state printers who contract with LaBelle's to produce these flyers and catalogs. LaBelle's provided South Dakota addresses where the materials were to be delivered.

[¶ 10.] In *Modern Merchandising*, the Department argued that LaBelle's used "the flyers and catalogs to generate sales in South Dakota and to operate its catalog business." In rejecting this argument as a basis for levying use tax, we found that LaBelle's had no in-state contract for the services and all control over the flyers and catalogs in South Dakota vested in either the post office or the recipients. We held that the Department's focus on whether the materials generated sales to support a use tax was erroneous; instead, the inquiry should turn on whether the language of the taxing statutes applied.[4]

3. SDCL 10–46–2.1:

   For the privilege of using services in South Dakota, except those types of services exempted by § 10–46–17.3, there is imposed on the person using the service an excise tax equal to four percent of the value of the services at the time they are rendered....
   SDCL 10–46–1(13):
   "Use," the exercise of right or power over tangible personal property incidental to the ownership of that property, except that it does not include the sale of that property in the regular course of business. Use also includes the use of the types of services, the gross receipts from the sale of which are to be included in the measure of the tax imposed by chapter 10–45, and any amendments thereto and the delivery or causing delivery into this state of tangible personal property intended to advertise products or services or promote or facilitate sales to South Dakota residents.

4. Following the decision in *Modern Merchandising*, the Legislature altered the definition of "use" to include "the delivery or causing delivery into this state of tangible personal property intended to advertise products or services or promote or facilitate sales to South Dakota residents." 1987 SDSessL ch 108, § 1. This change is now codified in SDCL 10–46–1(13).

[¶ 11.] Western asserts that, as in *Modern Merchandising,* no use tax applies here because it "has contracted for the printing of [its] bills by a third party, and as a result Western does not generate, print, or mail the bills to in-state residents; the bill preparer/printer controls all of these functions and the bills themselves." Western equates these "tangible itemized written bills" with the advertising materials sent to South Dakota residents. Moreover, Western points out that even the amended language in SDCL 10–46–1(13), added in response to the *Modern Merchandising* decision, will not encompass these transactions because the invoices do not "advertise products or services or promote or facilitate sales to South Dakota residents." Western believes that there is an insufficient nexus between the cost of producing the billing statements and South Dakota to justify use tax and, therefore, the billing service is outside the statutory reach of the tax.

[¶ 12.] *Modern Merchandising* dealt with whether a merchandiser had sufficient right or power incidental to ownership of advertising materials sent from out of state to qualify as a use in this state of tangible personal property. 397 N.W.2d at 472–73; *see* SDCL 10–46–1(2) and 2. On the other hand, our decision in *Thermoset Plastics, Inc. v. Department of Revenue,* 473 N.W.2d 136 (S.D.1991) addressed the in-state use of out-of-state services. The service in that case was provided by an out-of-state accounting firm to a South Dakota business. Before commencing operations in South Dakota, Thermoset incurred $8,000 in fees for the preparation of a cash flow statement by the Arthur Andersen accounting firm in Phoenix, Arizona. In holding that the cost of the cash flow statement was subject to use tax in South Dakota, we wrote: "Thermoset used these accounting services in South Dakota to conduct its business and is therefore sub-

ject to use tax on these services." *Id.* at 139. In sum, the out-of-state accounting service directly applied to *Thermoset's* activities in this state and thus use tax was properly assessed.

[¶ 13.] The relevant definition of "use" in SDCL 10–46–1(13) states that "Use also includes the use of the types of *services,* the gross receipts from the sale of which are to be included in the measure of the tax imposed by chapter 10–45.... " (Emphasis added.) *See* SDCL 10–46–2.1. Here, the Department is not seeking to tax the purchase and use of tangible personal property. Yet, Western wishes us to view the billing service as simply the printing and mailing of tangible invoices, apart from the essential service it purchases. Western reasons that no use tax applies because it does not "generate, print or mail the bills," and the bills "do not generate sales," do not contain "advertising materials," and have no "information to facilitate sales." That analysis, from *Modern Merchandising,* applies to the out-of-state purchase of tangible personal property, i.e., advertising materials, for use in South Dakota. If the same analysis applies to services, then *Thermoset Plastics* was wrongly decided. There, the out-of-state accounting bill for services that we held was subject to use tax did "not generate sales," did not contain "advertising materials," and had no "information to facilitate sales," and moreover, *Thermoset* did "not generate, print or mail the bills" for the out-of-state accounting services.

■ [¶ 14.] Our analysis in *Thermoset* applies to these circumstances. As in *Thermoset,* Western uses the billing service "in South Dakota to conduct its business and is therefore subject to use tax on these services." *Thermoset,* 473 N.W.2d at 139. What is involved here is more than merely the arranging for paper in-

voices to be mailed to South Dakota residents. This activity is predominantly the performance of a service. SDCL 10–45–4.1. As the circuit court aptly phrased it, "there can be no dispute that billing customers is a necessary part of conducting a cellular telephone business." Unquestionably, if this billing service were provided by a South Dakota based company, it would be required to collect sales tax on its fees. *See* SDCL 10–45–4.1. *Union Pacific R.R. Co. v. Auditing Div. of Utah State Tax Comm'n*, 842 P.2d 876 (Utah 1992). Use tax is compensatory or complementary to sales tax. Western uses an out-of-state billing service to collect its fees from its South Dakota subscribers. Only those billing services specifically attributable to South Dakota customers are subject to the tax. This service is an integral part of Western's business in South Dakota. Indeed, there would be no business without it. We uphold the imposition of use tax.

## D.

### Constitutionality of Use Tax

[¶ 15.] Western next contends that because this billing service is rendered by an out-of-state contractor, South Dakota's imposition of use tax here is a burden on interstate commerce. To determine if this tax is unconstitutional, we look to the Supreme Court's decision in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). A tax is not an unconstitutional burden on interstate commerce if the taxed activity is sufficiently connected to the state to justify the tax, the tax is fairly related to benefits provided to the taxpayer, the tax does not discriminate against interstate commerce, and the tax is fairly apportioned. The use tax here passes these tests. *Id.* at 287, 97 S.Ct. at 1083.

[¶ 16.] South Dakota has a substantial nexus with the taxed activity. Western provides cellular telephone service to its South Dakota subscribers. It owns communications equipment and conducts business in South Dakota. It employs personnel in South Dakota to install and maintain the equipment. Electronic statistics on subscriber usage are transferred from South Dakota, where it originates, to Western's billing service contractor who, in turn, arranges for the South Dakota customers to receive bills for their usage.

[¶ 17.] Equal treatment for instate and out-of-state transactions similarly situated is a prerequisite to a valid use tax on goods and services imported from out-of-state. *Halliburton*, 373 U.S. at 70, 83 S.Ct. at 1204. South Dakota's use tax on services will apply to the use of a taxable service purchased inside or outside this state when the primary benefit of the service is used or consumed in this state and, at the time of purchase, sales tax was not imposed. This use tax is fairly related to state-provided services because Western has the right and benefit of selling its services to South Dakota residents. The use tax does not discriminate against interstate commerce because the tax compensates the state for sales tax imposed on similar in-state transactions. *D.H. Holmes Co., Ltd. v. McNamara*, 486 U.S. 24, 108 S.Ct. 1619, 100 L.Ed.2d 21 (1988). Finally, the tax is fairly apportioned because (1) the services taxed are only those attributable to the billing of South Dakota subscribers, and (2) our law provides a credit against use tax for transactions in which a sales tax was paid in other states. SDCL 10–46–6.1.

[¶ 18.] The fair-apportionment analysis was employed by the *Supreme Court in Goldberg v. Sweet*, 488 U.S. 252, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989). There, the Court held that the tax must be internally and externally consistent. To

be externally consistent under *Goldberg*, a state may tax "only that portion of the revenues from the interstate activity which reasonably reflects the in-state component of the activity being taxed." *Id.* at 262, 109 S.Ct. at 589. South Dakota's use tax reasonably reflects the way that Western uses this service. It receives the service in South Dakota when its South Dakota customers are billed for their cellular usage. The primary benefit of the service is used or consumed here. "To be internally consistent, a tax must be structured so that if every State were to impose an identical tax, no multiple taxation would result." *Id.* at 261, 109 S.Ct. at 589. Here, if every state taxed the billing service attributable only to that state's customers, as South Dakota does, only one state, the state where that service was provided, would tax the transaction. Further, as mentioned above, South Dakota allows a credit for sales taxes paid to other states. Under *Goldberg*, this credit provision avoids actual multiple taxation, and, thus, the tax does not threaten interstate commerce.

[¶ 19.] It is true that, as Western points out, our law allows no credit for taxes paid in another state where that state "does not reciprocally grant a credit for taxes paid on similar tangible personal property." SDCL 10–46–6.1. Assuming this statute applies to services the same as it does to tangible personal property, then this conditional reciprocity could present a problem in the future. It is critical, as the Supreme Court acknowledges, that these statutory "credit provisions create a national system under which the first state of purchase or use imposes the tax. Thereafter, no other state taxes the transaction unless there has been no prior tax imposed . . . or if the tax rate of the prior taxing state is less, in which case the subsequent taxing state imposes a tax measured only by the differential rate." *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 194, 115 S.Ct. 1331, 1343, 131 L.Ed.2d 261 (1995) (quoting *KSS Transportation Corp. v. Baldwin*, 9 N.J.Tax 273, 285 (1987)). However, Western does not assert that any sales or use taxes have been paid on all or part of these services in any other state nor has it sought any credit for payment of such taxes. Under these circumstances, therefore, the point is moot.

[¶ 20.] Affirmed.

[¶ 21.] GILBERTSON, Chief Justice, and SABERS, Justice, concur.

[¶ 22.] MILLER and AMUNDSON, Retired Justices, dissent.

[¶ 23.] MILLER, Retired Justice, sitting for ZINTER, Justice, disqualified.

[¶ 24.] MEIERHENRY, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.

MILLER, Retired Justice (dissenting).

[¶ 25.] The majority opinion misconstrues the definition of "use" as that term has been legislatively defined and interpreted by the prior precedent of this Court. I agree with the majority opinion's recognition that the use tax is aimed to remedy concerns that the state may lose tax revenue if taxpayers purchase out-of-state goods or services for in-state use and that local providers will lose business if those out of state purchases avoid tax liability. However, those concerns cannot justify the imposition of a tax unless that tax is clearly articulated in the statutory framework. As the following discussion demonstrates, the state's remedy is legislative and not judicial.

[¶ 26.] **The imposition of a use tax on the billing services is legally and factually unsupported.**

[¶ 27.] In support of its assertion supporting imposition of the use tax Department relies upon the following statutory provisions:

*10–46–2.1. Use tax—Tax imposed on use of services—Exemptions—"Related corporation" defined.* For the privilege of using services in South Dakota, except those types of services exempted by § 10–46–17.3, there is imposed on the person using the service an excise tax equal to four percent of the value of the services at the time they are rendered. However, this tax may not be imposed on any service rendered by a related corporation as defined in subdivision (11) of § 10–43–1 for use by a financial institution as defined in subdivision (4) of § 10–43–1 or on any service rendered by a financial institution as defined in subdivision (4) of § 10–43–1 for use by a related corporation as defined in subdivision (11) of § 10–43–1. For the purposes of this section, the term related corporation includes a corporation which together with the financial institution is part of a controlled group of corporations as defined in 26 USC § 1563 as in effect on January 1, 1989, except that the eighty percent ownership requirements set forth in 26 USC § 1563(a)(2)(A) for a brother-sister controlled group are reduced to fifty-one percent. For the purpose of this chapter, services rendered by an employee for the use of his employer are not taxable.

*SDCL 10–46–1(13) Use,* the exercise of right or power over tangible personal property incidental to the ownership of that property, except that it does not include the sale of that property in the regular course of business. Use also includes the use of the types of services, the gross receipts from the sale of which are to be included in the measure of the tax imposed by chapter 10–45, and any amendments thereto and the delivery or causing delivery into this state of tangible personal property intended to advertise products or services or promote or facilitate sales to South Dakota residents.

[¶ 28.] Western counters asserting that the use tax law contains an inherent limitation requiring the use of the billing services to occur in the State of South Dakota. Western also argues that the billing services and the statements produced constitute personal property and not services for tax purposes. On these facts, Western argues that there is an insufficient nexus between the cost of producing the billing statements and the State of South Dakota to justify use tax. Both parties assert that prior use tax decisions of this Court are dispositive.

[¶ 29.] In *Thermoset Plastics, Inc. v. Department of Revenue,* 473 N.W.2d 136 (S.D.1991), this Court addressed a use tax assessment for services provided by an out-of-state accounting firm to a South Dakota corporation. Prior to commencing operations in South Dakota, Thermoset incurred $8,000 in fees for the preparation of a cash flow statement by the Arthur Anderson accounting firm in Phoenix, Arizona. In holding that the cash flow statement was subject to use tax in South Dakota, the Court stated:

Thermoset's transaction with Arthur Anderson is subject to tax under SDCL 10–46–2.1. Although some of Arthur Anderson's services may have become obsolete when the designs of various plates were changed, some of the machinery included in the study is still being used in South Dakota. Further even if these plate designs are obsolete now, they were not obsolete at the time the services were rendered. Thermoset used these accounting services in South

Dakota to conduct its business and is therefore subject to use tax on these services. *Id.* at 139.

[¶ 30.] In that case, the record revealed that items of equipment examined in the cash flow statement were a product line being used in South Dakota. Therefore, there was a link between the out-of-state service and the sale of products with a resulting use in South Dakota by Thermoset. Department therefore claims that because billing services are a necessary part of Western's business in South Dakota this rationale is applicable to support a use tax on the cost of those services provided outside South Dakota.

[¶ 31.] To the contrary, Western relies upon our decision in *Modern Merchandising, Inc. v. Department,* 397 N.W.2d 470 (S.D.1986), to assert the inapplicability of the use tax. In *Modern Merchandising,* this Court reversed the imposition of use tax for the cost of catalogs and flyers mailed to South Dakota residents by LaBelle's Corporation. LaBelle's retailed consumer goods by mail order and through stores located in Minnesota, North Dakota and South Dakota. The materials were printed in Minnesota and delivered to South Dakota by mail or through a common carrier by out-of-state printers contracted by LaBelle's to provide these flyers and catalogs. LaBelle's only involvement was providing the South Dakota addresses of where the literature was to be delivered. *Id.* The issue on appeal was whether "LaBelle's had sufficient right or power incidental to the ownership of the catalogs and flyers once in South Dakota to qualify as a use in this State under SDCL 10–46–1(2) and 2."

[¶ 32.] In *Modern Merchandising,* Department argued that Labelle's used "the flyers and catalogs to generate sales in South Dakota and to operate its catalog business" to justify imposition of the use tax. *Id.* at 471. Rejecting this argument, the Court recognized that LaBelle's had no in-state contract for these services and all control over the flyers and catalogs in South Dakota vested in either the post office or item recipients. ("Department concentrated more on the material's generation of in-state sales for LaBelle's than on whether LaBelle's activities fit the language of the tax statutes.") Furthermore, the Court rejected Department's policy argument that use tax was applicable if by not imposing the tax our in-state retailers would be at a disadvantage when compared to out-of-state competitors and that if a local entity must pay a tax then so should the outside entity providing the same services. We have recognized "that not only was the use tax intended to raise money but it was also intended to help the retailers in this state, who are subject to the sales tax, compete on an equal footing with out-of-state competitors." *Northwestern Nat'l Bank of Sioux Falls v. Gillis,* 82 S.D. 457, 467, 148 N.W.2d 293, 298 (1967). We must remember, however, that despite the legislative intent, this Court cannot rewrite a taxing statute based on arguments of a competitive disadvantage that purportedly occurs as a result of the statutory framework or a perceived unfairness. The Court in *Modern Merchandising* observed: "While we agree with Department's interpretation of our legislature's intent, we cannot apply the statute to activity which is plainly alien to its language. We must honor the rule that statutes imposing a tax are to be construed liberally in favor of the taxpayer." *Modern Merchandising, supra* at 472. Though Department's concerns may have been valid, "this contention is more appropriately directed to the legislature."

[¶ 33.] Following the decision in *Modern Merchandising,* the legislature altered

the definition of "use" to state that "the delivery or causing delivery into this state of tangible personal property *intended to advertise products or services or promote or facilitate sales to South Dakota residents*" constitutes a "use" within the meaning of the legislative framework. (emphasis added). 1987 SD Sess.L. ch. 108, § 1. This change is now codified at SDCL 10–46–1(13). While the *Modern Merchandising* holding has thus been abrogated by the legislature, the holding's reasoning is still valid: Department cannot exceed its statutory grant of authority.

[¶ 34.] The majority opinion's flaw is best demonstrated by comparing this situation to another case where use tax was found to be proper, *Quotron Systems, Inc. v. Limbach,* 62 Ohio St.3d 447, 584 N.E.2d 658 (1992). In *Quotron,* the Ohio Supreme Court determined that use tax was appropriately imposed on a computer service that provided access to computer equipment enabling subscribers in Ohio to examine or acquire data stored by that system out of state. *Id.* at 659. However, the relevant Ohio taxing authority specifically imposed tax upon automatic data processing and computer services. *Id.* Furthermore, the Ohio court quotes the following from the Ohio legislative pronouncements:

> R.C. 5739.01 defined automatic data processing and computer services, until January 10, 1985, to include "providing direct access to computer equipment by remote or proximate access for the purpose of processing data or examining or acquiring data stored in or accessible to such computer equipment," and after this date, to include "providing access to computer equipment for the purpose of processing data or examining or acquiring data stored in or accessible to such computer equipment."

Consequently, the Ohio court determined the taxing statutes applied to the data processing services and that use tax was properly imposed. *Id.* In comparing that taxing authority with the statutes relied upon by Department the Ohio statutory authorization for imposing the use tax on data processing and computer services is clearly more sophisticated and direct than that relied upon by the Department here. This is fatal to Department's argument. The statutory authorization for collection of use tax is to be construed liberally in favor of the taxpayer, however, the majority opinion misconstrues the taxing authority liberally in favor of the Department.

[¶ 35.] Under our system the predicate for use tax under SDCL 10–46–2.1 is "using services in South Dakota" that are non-exempt. Western has contracted for billing services with an out-of-state third party. Western itself does not generate, print or mail the bills to South Dakota residents. When the bills arrive in South Dakota they are controlled by the United States mail or the customers receiving the bills. While Western's bills serve the purpose of providing its customers with information concerning their account, the billing services do not themselves generate sales. There are no facts establishing that these billing statements contain advertising materials or information to facilitate sales as part of the billing service. In this situation, the sale of cellular service is already complete when the billing statements arrive to the South Dakota customer. A billing statement for services previously rendered clearly is not something delivered "to advertise products or services or promote or facilitate sales." Comparing the billing services with the catalogs and flyers at issue in *Modern Merchandising* and the accounting services in *Thermoset,* the billing services more closely resemble the catalogs and flyers in *Modern Merchandising.*

[¶ 36.] The circuit court attempted to distinguish the *Modern Merchandising,* holding by asserting its result was controlled by SDCL 10–46–2 and not SDCL 10–46–2.1, upon which Department now relies. However, both statutory provisions are governed by the definition of "use" provided in SDCL 10–46–1(13). The circuit court determined that "although each individual component of that billing service was produced in other states, the completed billing service was acquired for 'use' in South Dakota to bill [Western's] South Dakota customers and to conduct [Western's] South Dakota cellular telephone business." While Department urged, and the circuit court found, the billing services as a whole constituted a "use" in South Dakota, this expansive view of Department's taxing authority is contrary to the dictate that we narrowly construe the taxing authority. Clearly, the circuit court characterized the "complete billing service" as a taxable event because the bills inevitably entered the state through the mail and arrived where Western directed. However, this is contrary to the rationale set forth in *Modern Merchandising,* which determined the use tax did not apply in such limited circumstances. *See Modern Merchandising,* 397 N.W.2d at 472.

[¶ 37.] When viewing the billing process as a whole, the facts do not establish a "use" in the state to support taxation. While it cannot be disputed that the South Dakota bills are a product of Western's business in South Dakota, that is not the test to determine if the billing services are "used" within South Dakota to support the tax. The legislative change to the definition of "use" does not apply in this situation. It is significant that the legislature chose to exclusively incorporate advertising materials to promote or facilitate sales that are sent to the State as part of the definition of "use." Though the result in *Modern Merchandising* has been altered by legislative action, the analytical method remains intact. The legislative modification to the definition of use does not apply and the rationale of *Modern Merchandising* is controlling. Applying these facts to the rationale of *Modern Merchandising,* and even considering the legislative change, the record does not establish the billing services were "used" in the State of South Dakota within the definition of the term as it now exists.

[¶ 38.] Therefore, I dissent.

[¶ 39.] AMUNDSON, Retired Justice, joins this dissent.