# OKLAHOMA TAX COMMISSION *v.* JEFFERSON LINES, INC.

No. 93–1677.   Argued November 28, 1994—Decided April 3, 1995

SOUTER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, KENNEDY, and GINSBURG, JJ., joined. SCALIA, J., filed an opinion concurring in the judgment, in which THOMAS, J., joined, *post*, p. 200. BREYER, J., filed a dissenting opinion, in which O'CONNOR, J., joined, *post*, p. 201.

*Stanley P. Johnston* argued the cause and filed a brief for petitioner.

*Steven D. DeRuyter* argued the cause for respondent. With him on the brief was *Loren A. Unterseher.**

JUSTICE SOUTER delivered the opinion of the Court.

This case raises the question whether Oklahoma's sales tax on the full price of a ticket for bus travel from Oklahoma to another State is consistent with the Commerce Clause, U. S. Const., Art. I, § 8, cl. 3. We hold that it is.

## I

Oklahoma taxes sales in the State of certain goods and services, including transportation for hire. Okla. Stat., Tit. 68, § 1354(1)(C) (Supp. 1988).[1] The buyers of the taxable

---

*\*Richard Ruda* and *Lee Fennell* filed a brief for the National Conference of State Legislatures et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the American Bus Association by *Richard A. Allen;* and for Greyhound Lines, Inc., by *John B. Turner, Rebecca M. Fowler, Oscar R. Cantu,* and *Debra A. Dandeneau.*

[1] At the time relevant to the taxes at issue here, § 1354 provided as follows: "There is hereby levied upon all sales . . . an excise tax of four percent (4%) of the gross receipts or gross proceeds of each sale of the following . . . (C) Transportation for hire to persons by common carriers,

goods and services pay the taxes, which must be collected and remitted to the State by sellers. § 1361.

Respondent Jefferson Lines, Inc., is a Minnesota corporation that provided bus services as a common carrier in Oklahoma from 1988 to 1990. Jefferson did not collect or remit the sales taxes for tickets it had sold in Oklahoma for bus travel from Oklahoma to other States, although it did collect and remit the taxes for all tickets it had sold in Oklahoma for travel that originated and terminated within that State.

After Jefferson filed for bankruptcy protection on October 27, 1989, petitioner, Oklahoma Tax Commission, filed proof of claims in Bankruptcy Court for the uncollected taxes for tickets for interstate travel sold by Jefferson.[2] Jefferson cited the Commerce Clause in objecting to the claims, and argued that the tax imposes an undue burden on interstate commerce by permitting Oklahoma to collect a percentage of the full purchase price of all tickets for interstate bus travel, even though some of that value derives from bus travel through other States. The tax also presents the danger of multiple taxation, Jefferson claimed, because any other State through which a bus travels while providing the services sold in Oklahoma will be able to impose taxes of their own upon Jefferson or its passengers for use of the roads.

The Bankruptcy Court agreed with Jefferson, the District Court affirmed, and so did the United States Court of Appeals for the Eighth Circuit. *In re Jefferson Lines, Inc.,* 15

---

including railroads both steam and electric, motor transportation companies, taxicab companies, pullman car companies, airlines, and other means of transportation for hire." As a result of recent amendments, the statute presently provides for a $4^{1}/_{2}$ percent tax rate.

[2] The parties have stipulated that the dispute concerns only those taxes for Jefferson's in-state sales of tickets for travel starting in Oklahoma and ending in another State. App. 5; Tr. of Oral Arg. 3–4. The Commission does not seek to recover any taxes for tickets sold in Oklahoma for travel wholly outside of the State or for travel on routes originating in other States and terminating in Oklahoma. Accordingly, the validity of such taxes is not before us.

F. 3d 90 (1994). The Court of Appeals held that Oklahoma's tax was not fairly apportioned, as required under the established test for the constitutionality of a state tax on interstate commerce. See *Complete Auto Transit, Inc.* v. *Brady,* 430 U. S. 274, 279 (1977). The Court of Appeals understood its holding to be compelled by our decision in *Central Greyhound Lines, Inc.* v. *Mealey,* 334 U. S. 653 (1948), which held unconstitutional an unapportioned state tax on the gross receipts[3] of a company that sold tickets for interstate bus travel. The Court of Appeals rejected the Commission's position that the sale of a bus ticket is a wholly local transaction justifying a sales tax on the ticket's full value in the State where it is sold, reasoning that such a tax is indistinguishable from the unapportioned tax on gross receipts from interstate travel struck down in *Central Greyhound.* 15 F. 3d, at 92–93. We granted certiorari, 512 U. S. 1204 (1994), and now reverse.

## II

Despite the express grant to Congress of the power to "regulate Commerce . . . among the several States," U. S. Const., Art. I, § 8, cl. 3, we have consistently held this language to contain a further, negative command, known as the dormant Commerce Clause, prohibiting certain state taxation even when Congress has failed to legislate on the subject. *Quill Corp.* v. *North Dakota,* 504 U. S. 298, 309 (1992); *Northwestern States Portland Cement Co.* v. *Minnesota,* 358 U. S. 450, 458 (1959); *H. P. Hood & Sons, Inc.* v. *Du Mond,* 336 U. S. 525, 534–535 (1949); cf. *Gibbons* v. *Ogden,* 9 Wheat. 1, 209 (1824) (Marshall, C. J.) (dictum). We have understood this construction to serve the Commerce Clause's purpose of

---

[3] We follow standard usage, under which gross receipts taxes are on the gross receipts from sales payable by the seller, in contrast to sales taxes, which are also levied on the gross receipts from sales but are payable by the buyer (although they are collected by the seller and remitted to the taxing entity). P. Hartman, Federal Limitations on State and Local Taxation §§ 8:1, 10:1 (1981).

preventing a State from retreating into economic isolation or jeopardizing the welfare of the Nation as a whole, as it would do if it were free to place burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear. The provision thus "'reflect[s] a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.'" *Wardair Canada Inc.* v. *Florida Dept. of Revenue*, 477 U. S. 1, 7 (1986), quoting *Hughes* v. *Oklahoma*, 441 U. S. 322, 325–326 (1979); see also The Federalist Nos. 42 (J. Madison), 7 (A. Hamilton), 11 (A. Hamilton).

The command has been stated more easily than its object has been attained, however, and the Court's understanding of the dormant Commerce Clause has taken some turns. In its early stages, see 1 J. Hellerstein & W. Hellerstein, State Taxation ¶¶ 4.05–4.08 (2d ed. 1993) (hereinafter Hellerstein & Hellerstein); Hartman, *supra* n. 3, §§ 2:9–2:16, the Court held the view that interstate commerce was wholly immune from state taxation "in any form," *Leloup* v. *Port of Mobile*, 127 U. S. 640, 648 (1888), "even though the same amount of tax should be laid on [intrastate] commerce," *Robbins* v. *Shelby County Taxing Dist.*, 120 U. S. 489, 497 (1887); see also *Cooley* v. *Board of Wardens of Port of Philadelphia ex rel. Soc. for Relief of Distressed Pilots*, 12 How. 299 (1852); *Brown* v. *Maryland*, 12 Wheat. 419 (1827). This position gave way in time to a less uncompromising but formal approach, according to which, for example, the Court would invalidate a state tax levied on gross receipts from interstate commerce, *New Jersey Bell Telephone Co.* v. *State Bd. of Taxes and Assessments of N. J.*, 280 U. S. 338 (1930); *Meyer* v. *Wells, Fargo & Co.*, 223 U. S. 298 (1912), or upon the "freight carried" in interstate commerce, *Case of the State*

*Freight Tax,* 15 Wall. 232, 278 (1873), but would allow a tax merely measured by gross receipts from interstate commerce as long as the tax was formally imposed upon franchises, *Maine* v. *Grand Trunk R. Co.,* 142 U. S. 217 (1891), or " 'in lieu of all taxes upon [the taxpayer's] property,' " *United States Express Co.* v. *Minnesota,* 223 U. S. 335, 346 (1912).[4] See generally Lockhart, Gross Receipts Taxes on Interstate Transportation and Communication, 57 Harv. L. Rev. 40, 43–66 (1943) (hereinafter Lockhart). Dissenting from this formal approach in 1927, Justice Stone remarked that it was "too mechanical, too uncertain in its application, and too remote from actualities, to be of value." *Di Santo* v. *Pennsylvania,* 273 U. S. 34, 44 (1927) (dissenting opinion).

In 1938, the old formalism began to give way with Justice Stone's opinion in *Western Live Stock* v. *Bureau of Revenue,* 303 U. S. 250, which examined New Mexico's franchise tax, measured by gross receipts, as applied to receipts from out-of-state advertisers in a journal produced by taxpayers in New Mexico but circulated both inside and outside the State. Although the assessment could have been sustained solely on prior precedent, see *id.,* at 258; Lockhart 66, and n. 122, Justice Stone added a dash of the pragmatism that, with a brief interlude, has since become our aspiration in this quarter of the law. The Court had no trouble rejecting the claim that the "mere formation of the contract between persons in different states" insulated the receipts from taxation, *Western Live Stock,* 303 U. S., at 253, and it saw the business of "preparing, printing and publishing magazine advertising [as] peculiarly local" and therefore subject to taxation by the

---

[4] The Court had indeed temporarily adhered to an additional distinction between taxes upon interstate commerce such as that struck down in the *Case of State Freight Tax,* and taxes upon gross receipts from such commerce, which were upheld that same Term in *State Tax on Railway Gross Receipts,* 15 Wall. 284 (1873). This nice distinction was abandoned prior to the *New Jersey Bell* case in *Philadelphia & Southern S. S. Co.* v. *Pennsylvania,* 122 U. S. 326 (1887).

State within which the business operated. *Id.*, at 258. The more "vexed question," however, was one that today we would call a question of apportionment: whether the interstate circulation of the journal barred taxation of receipts from advertisements enhanced in value by the journal's wide dissemination. *Id.*, at 254. After rebuffing any such challenge on the ground that the burden on interstate commerce was "too remote and too attenuated" in the light of analogous taxation of railroad property, *id.*, at 259, Justice Stone provided an "added reason" for sustaining the tax:

> "So far as the value contributed to appellants' New Mexico business by circulation of the magazine interstate is taxed, it cannot again be taxed elsewhere any more than the value of railroad property taxed locally. The tax is not one which in form or substance can be repeated by other states in such manner as to lay an added burden on the interstate distribution of the magazine." *Id.*, at 260.

The Court explained that "[i]t was not the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of state tax burden even though it increases the cost of doing the business." *Id.*, at 254. Soon after *Western Live Stock*, the Court expressly rested the invalidation of an unapportioned gross receipts tax on the ground that it violated the prohibition against multiple taxation:

> "The vice of the statute as applied to receipts from interstate sales is that the tax includes in its measure, without apportionment, receipts derived from activities in interstate commerce; and that the exaction is of such a character that if lawful it may in substance be laid to the fullest extent by States in which the goods are sold as well as those in which they are manufactured." *J. D. Adams Mfg. Co.* v. *Storen*, 304 U. S. 307, 311 (1938).

See also *Gwin, White & Prince, Inc.* v. *Henneford*, 305 U. S. 434, 438–439 (1939).

After a brief resurgence of the old absolutism that proscribed all taxation formally levied upon interstate commerce, see *Freeman* v. *Hewit*, 329 U. S. 249 (1946); *Spector Motor Service, Inc.* v. *O'Connor*, 340 U. S. 602 (1951), the Court returned to *Western Live Stock*'s multiple taxation rule in *Northwestern States Portland Cement Co.* v. *Minnesota*, 358 U. S. 450 (1959), and we categorically abandoned the latter-day formalism when *Complete Auto Transit, Inc.* v. *Brady*, 430 U. S. 274 (1977), overruled *Spector* and *Freeman.* In *Complete Auto*, a business engaged in transporting cars manufactured outside the taxing State to dealers within it challenged a franchise tax assessed equally on all gross income derived from transportation for hire within the State. The taxpayer's challenge resting solely on the fact that the State had taxed the privilege of engaging in an interstate commercial activity was turned back, and in sustaining the tax, we explicitly returned to our prior decisions that

> "considered not the formal language of the tax statute but rather its practical effect, and have sustained a tax against Commerce Clause challenge when the tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." 430 U. S., at 279.

Since then, we have often applied, and somewhat refined, what has come to be known as *Complete Auto*'s four-part test. See, *e. g., Goldberg* v. *Sweet*, 488 U. S. 252 (1989) (tax on telephone calls); *D. H. Holmes Co.* v. *McNamara*, 486 U. S. 24 (1988) (use tax); *Container Corp. of America* v. *Franchise Tax Bd.*, 463 U. S. 159 (1983) (franchise tax); *Commonwealth Edison Co.* v. *Montana*, 453 U. S. 609 (1981) (severance tax). We apply its criteria to the tax before us today.

## III

### A

It has long been settled that a sale of tangible goods has a sufficient nexus to the State in which the sale is consummated to be treated as a local transaction taxable by that State. *McGoldrick* v. *Berwind-White Coal Mining Co.,* 309 U. S. 33 (1940) (upholding tax on sale of coal shipped into taxing State by seller). So, too, in addressing the interstate provision of services, we recently held that a State in which an interstate telephone call originates or terminates has the requisite Commerce Clause nexus to tax a customer's purchase of that call as long as the call is billed or charged to a service address, or paid by an addressee, within the taxing State. *Goldberg, supra,* at 263. Oklahoma's tax falls comfortably within these rules. Oklahoma is where the ticket is purchased, and the service originates there. These facts are enough for concluding that "[t]here is 'nexus' aplenty here." See *D. H. Holmes, supra,* at 33. Indeed, the taxpayer does not deny Oklahoma's substantial nexus to the instate portion of the bus service, but rather argues that nexus to the State is insufficient as to the portion of travel outside its borders. This point, however, goes to the second prong of *Complete Auto,* to which we turn.

### B

The difficult question in this case is whether the tax is properly apportioned within the meaning of the second prong of *Complete Auto's* test, "the central purpose [of which] is to ensure that each State taxes only its fair share of an interstate transaction." *Goldberg, supra,* at 260–261. This principle of fair share is the lineal descendant of *Western Live Stock's* prohibition of multiple taxation, which is threatened whenever one State's act of overreaching combines with the possibility that another State will claim its fair share of the value taxed: the portion of value by which

one State exceeded its fair share would be taxed again by a State properly laying claim to it.

For over a decade now, we have assessed any threat of malapportionment by asking whether the tax is "internally consistent" and, if so, whether it is "externally consistent" as well. See *Goldberg, supra,* at 261; *Container Corp., supra,* at 169. Internal consistency is preserved when the imposition of a tax identical to the one in question by every other State would add no burden to interstate commerce that intrastate commerce would not also bear. This test asks nothing about the degree of economic reality reflected by the tax, but simply looks to the structure of the tax at issue to see whether its identical application by every State in the Union would place interstate commerce at a disadvantage as compared with commerce intrastate. A failure of internal consistency shows as a matter of law that a State is attempting to take more than its fair share of taxes from the interstate transaction, since allowing such a tax in one State would place interstate commerce at the mercy of those remaining States that might impose an identical tax. See *Gwin, White & Prince,* 305 U. S., at 439. There is no failure of it in this case, however. If every State were to impose a tax identical to Oklahoma's, that is, a tax on ticket sales within the State for travel originating there, no sale would be subject to more than one State's tax.

External consistency, on the other hand, looks not to the logical consequences of cloning, but to the economic justification for the State's claim upon the value taxed, to discover whether a State's tax reaches beyond that portion of value that is fairly attributable to economic activity within the taxing State. See *Goldberg, supra,* at 262; *Container Corp., supra,* at 169–170. Here, the threat of real multiple taxation (though not by literally identical statutes) may indicate a State's impermissible overreaching. It is to this less tidy world of real taxation that we turn now, and at length.

1

The very term "apportionment" tends to conjure up allocation by percentages, and where taxation of income from interstate business is in issue, apportionment disputes have often centered around specific formulas for slicing a taxable pie among several States in which the taxpayer's activities contributed to taxable value. In *Moorman Mfg. Co.* v. *Bair*, 437 U. S. 267 (1978), for example, we considered whether Iowa could measure an interstate corporation's taxable income by attributing income to business within the State " 'in that proportion which the gross sales made within the state bear to the total gross sales.' " *Id.*, at 270. We held that it could. In *Container Corp.*, we decided whether California could constitutionally compute taxable income assignable to a multijurisdictional enterprise's in-state activity by apportioning its combined business income according to a formula "based, in equal parts, on the proportion of [such] business' total payroll, property, and sales which are located in the taxing State." 463 U. S., at 170. Again, we held that it could. Finally, in *Central Greyhound*, we held that New York's taxation of an interstate bus line's gross receipts was constitutionally limited to that portion reflecting miles traveled within the taxing jurisdiction. 334 U. S., at 663.

In reviewing sales taxes for fair share, however, we have had to set a different course. A sale of goods is most readily viewed as a discrete event facilitated by the laws and amenities of the place of sale, and the transaction itself does not readily reveal the extent to which completed or anticipated interstate activity affects the value on which a buyer is taxed. We have therefore consistently approved taxation of sales without any division of the tax base among different States, and have instead held such taxes properly measurable by the gross charge for the purchase, regardless of any activity outside the taxing jurisdiction that might have preceded the sale or might occur in the future. See, *e. g., McGoldrick* v. *Berwind-White Coal Mining Co., supra.*

Such has been the rule even when the parties to a sales contract specifically contemplated interstate movement of the goods either immediately before, or after, the transfer of ownership. See, *e. g., Wardair Canada Inc.* v. *Florida Dept. of Revenue,* 477 U. S. 1 (1986) (upholding sales tax on airplane fuel); *State Tax Comm'n of Utah* v. *Pacific States Cast Iron Pipe Co.,* 372 U. S. 605 (1963) *(per curiam)* (upholding tax on sale that contemplated purchaser's interstate shipment of goods immediately after sale). The sale, we held, was "an activity which . . . is subject to the state taxing power" so long as taxation did not "discriminat[e]" against or "obstruc[t]" interstate commerce, *Berwind-White,* 309 U. S., at 58, and we found a sufficient safeguard against the risk of impermissible multiple taxation of a sale in the fact that it was consummated in only one State. As we put it in *Berwind-White,* a necessary condition for imposing the tax was the occurrence of "a local activity, delivery of goods within the State upon their purchase for consumption." *Ibid.* So conceived, a sales tax on coal, for example, could not be repeated by other States, for the same coal was not imagined ever to be delivered in two States at once. Conversely, we held that a sales tax could not validly be imposed if the purchaser already had obtained title to the goods as they were shipped from outside the taxing State into the taxing State by common carrier. *McLeod* v. *J. E. Dilworth Co.,* 322 U. S. 327 (1944). The out-of-state seller in that case "was through selling" outside the taxing State. *Id.,* at 330. In other words, the very conception of the common sales tax on goods, operating on the transfer of ownership and possession at a particular time and place, insulated the buyer from any threat of further taxation of the transaction.

In deriving this rule covering taxation to a buyer on sales of goods we were not, of course, oblivious to the possibility of successive taxation of related events up and down the stream of commerce, and our cases are implicit with the understanding that the Commerce Clause does not forbid the

actual assessment of a succession of taxes by different States on distinct events as the same tangible object flows along. Thus, it is a truism that a sales tax to the buyer does not preclude a tax to the seller upon the income earned from a sale, and there is no constitutional trouble inherent in the imposition of a sales tax in the State of delivery to the customer, even though the State of origin of the thing sold may have assessed a property or severance tax on it. See *Berwind-White*, 309 U. S., at 53; cf. *Commonwealth Edison Co.* v. *Montana*, 453 U. S. 609 (1981) (upholding severance tax on coal mined within the taxing State). In light of this settled treatment of taxes on sales of goods and other successive taxes related through the stream of commerce, it is fair to say that because the taxable event of the consummated sale of goods has been found to be properly treated as unique, an internally consistent, conventional sales tax has long been held to be externally consistent as well.

## 2

A sale of services can ordinarily be treated as a local state event just as readily as a sale of tangible goods can be located solely within the State of delivery. Cf. *Goldberg* v. *Sweet*, 488 U. S. 252 (1989). Although our decisional law on sales of services is less developed than on sales of goods, one category of cases dealing with taxation of gross sales receipts in the hands of a seller of services supports the view that the taxable event is wholly local. Thus we have held that the entire gross receipts derived from sales of services to be performed wholly in one State are taxable by that State, notwithstanding that the contract for performance of the services has been entered into across state lines with customers who reside outside the taxing State. *Western Live Stock* v. *Bureau of Revenue*, 303 U. S. 250 (1938). So, too, as we have already noted, even where interstate circulation contributes to the value of magazine advertising purchased by the customer, we have held that the Commerce Clause does not preclude a tax on its full value by the State

of publication. *Id.*, at 254, 258–259. And where the services are performed upon tangible items retrieved from and delivered to out-of-state customers, the business performing the services may be taxed on the full gross receipts from the services, because they were performed wholly within the taxing State. *Department of Treasury of Ind.* v. *Ingram-Richardson Mfg. Co. of Ind.*, 313 U. S. 252 (1941). Interstate activity may be essential to a substantial portion of the value of the services in the first case and essential to performance of the services in the second, but sales with at least partial performance in the taxing State justify that State's taxation of the transaction's entire gross receipts in the hands of the seller. On the analogy sometimes drawn between sales and gross receipts taxes, see *International Harvester Co.* v. *Department of Treasury*, 322 U. S. 340, 347–348 (1944); but see *Norton Co.* v. *Department of Revenue of Ill.*, 340 U. S. 534, 537 (1951), there would be no reason to suppose that a different apportionment would be feasible or required when the tax falls not on the seller but on the buyer.

Cases on gross receipts from sales of services include one falling into quite a different category, however, and it is on this decision that the taxpayer relies for an analogy said to control the resolution of the case before us. In 1948, the Court decided *Central Greyhound Lines, Inc.* v. *Mealey*, 334 U. S. 653, striking down New York's gross receipts tax on transportation services imposed without further apportionment on the total receipts from New York sales of bus services, almost half of which were actually provided by carriage through neighboring New Jersey and Pennsylvania. The Court held the statute fatally flawed by the failure to apportion taxable receipts in the same proportions that miles traveled through the various States bore to the total. The similarity of *Central Greyhound* to this case is, of course, striking, and on the assumption that the economic significance of a gross receipts tax is indistinguishable from a tax on sales the Court of Appeals held that a similar mileage

apportionment is required here, see 15 F. 3d, at 92–93, as the taxpayer now argues.

We, however, think that *Central Greyhound* provides the wrong analogy for answering the sales tax apportionment question here. To be sure, the two cases involve the identical services, and apportionment by mileage per State is equally feasible in each. But the two diverge crucially in the identity of the taxpayers and the consequent opportunities that are understood to exist for multiple taxation of the same taxpayer. *Central Greyhound* did not rest simply on the mathematical and administrative feasibility of a mileage apportionment, but on the Court's express understanding that the seller-taxpayer was exposed to taxation by New Jersey and Pennsylvania on portions of the same receipts that New York was taxing in their entirety. The Court thus understood the gross receipts tax to be simply a variety of tax on income, which was required to be apportioned to reflect the location of the various interstate activities by which it was earned. This understanding is presumably the reason that the *Central Greyhound* Court said nothing about the arguably local character of the levy on the sales transaction.[5] Instead, the Court heeded *Berwind-White*'s warning about "[p]rivilege taxes requiring a percentage of the gross receipts from interstate transportation," which "if sustained, could be imposed wherever the interstate activity occurs . . . ." 309 U. S., at 45–46, n. 2.

Here, in contrast, the tax falls on the buyer of the services, who is no more subject to double taxation on the sale of these services than the buyer of goods would be. The taxable event comprises agreement, payment, and delivery of some of the services in the taxing State; no other State can claim to be the site of the same combination. The economic activity represented by the receipt of the ticket for "consumption" in the form of commencement and partial provision of the

---

[5] Although New York's tax reached the gross receipts only from ticket sales within New York State, 334 U. S., at 664, 666 (Murphy, J., dissenting), the majority makes no mention of this fact.

transportation thus closely resembles *Berwind-White*'s "delivery of goods within the State upon their purchase for consumption," *id.*, at 58, especially given that full "consumption" or "use" of the purchased goods within the taxing State has never been a condition for taxing a sale of those goods. Although the taxpayer seeks to discount these resemblances by arguing that sale does not occur until delivery is made, nothing in our case law supports the view that when delivery is made by services provided over time and through space a separate sale occurs at each moment of delivery, or when each State's segment of transportation State by State is complete. The analysis should not lose touch with the common understanding of a sale, see *Goldberg*, 488 U. S., at 262; the combined events of payment for a ticket and its delivery for present commencement of a trip are commonly understood to suffice for a sale.

In sum, the sales taxation here is not open to the double taxation analysis on which *Central Greyhound* turned, and that decision does not control. Before we classify the Oklahoma tax with standard taxes on sales of goods, and with the taxes on less complicated sales of services, however, two questions may helpfully be considered.

3

Although the sale with partial delivery cannot be duplicated as a taxable event in any other State, and multiple taxation under an identical tax is thus precluded, is there a possibility of successive taxation so closely related to the transaction as to indicate potential unfairness of Oklahoma's tax on the full amount of sale? And if the answer to that question is no, is the very possibility of apportioning by mileage a sufficient reason to conclude that the tax exceeds the fair share of the State of sale?

a

The taxpayer argues that anything but a *Central Greyhound* mileage apportionment by State will expose it to the

same threat of multiple taxation assumed to exist in that case: further taxation, that is, of some portion of the value already taxed, though not under a statute in every respect identical to Oklahoma's. But the claim does not hold up. The taxpayer has failed to raise any specter of successive taxes that might require us to reconsider whether an internally consistent tax on sales of services could fail the external consistency test for lack of further apportionment (a result that no sales tax has ever suffered under our cases).

If, for example, in the face of Oklahoma's sales tax, Texas were to levy a sustainable, apportioned gross receipts tax on the Texas portion of travel from Oklahoma City to Dallas, interstate travel would not be exposed to multiple taxation in any sense different from coal for which the producer may be taxed first at point of severance by Montana and the customer may later be taxed upon its purchase in New York. The multiple taxation placed upon interstate commerce by such a confluence of taxes is not a structural evil that flows from either tax individually, but it is rather the "accidental incident of interstate commerce being subject to two different taxing jurisdictions." Lockhart 75; See *Moorman Mfg. Co.*, 437 U. S., at 277.[6]

---

[6] Any additional gross receipts tax imposed upon the interstate bus line would, of course, itself have to respect well-understood constitutional strictures. Thus, for example, Texas could not tax the bus company on the full value of the bus service from Oklahoma City to Dallas when the ticket is sold in Oklahoma, because that tax would, among other things, be internally inconsistent. And if Texas were to impose a tax upon the bus company measured by the portion of gross receipts reflecting in-state travel, it would have to impose taxes on intrastate and interstate journeys alike. In the event Texas chose to limit the burden of successive taxes attributable to the same transaction by combining an apportioned gross receipts tax with a credit for sales taxes paid to Texas, for example, it would have to give equal treatment to service into Texas purchased subject to a sales tax in another State, which it could do by granting a credit for sales taxes paid to any State. See, *e. g., Henneford* v. *Silas Mason Co.*, 300 U. S. 577, 583–584 (1937) (upholding use tax which provided credit for sales taxes paid to any State); *Halliburton Oil Well Cementing Co.* v.

Nor has the taxpayer made out a case that Oklahoma's sales tax exposes any buyer of a ticket in Oklahoma for travel into another State to multiple taxation from taxes imposed upon passengers by other States of passage. Since a use tax, or some equivalent on the consumption of services, is generally levied to compensate the taxing State for its

*Reily,* 373 U. S. 64, 70 (1963) ("[E]qual treatment for in-state and out-of-state taxpayers similarly situated is the condition precedent for a valid use tax on goods imported from out-of-state"); *Maryland* v. *Louisiana,* 451 U. S. 725, 759 (1981) (striking down Louisiana's "first use" tax on imported gas because "the pattern of credits and exemptions allowed under the . . . statute undeniably violates this principle of equality"); *Tyler Pipe Industries, Inc.* v. *Washington State Dept. of Revenue,* 483 U. S. 232, 240–248 (1987) (striking down Washington's gross receipts wholesaling tax exempting in-state, but not out-of-state, manufacturers); see also *Boston Stock Exchange* v. *State Tax Comm'n,* 429 U. S. 318, 331–332 (1977).

Although we have not held that a State imposing an apportioned gross receipts tax that grants a credit for sales taxes paid in state must also extend such a credit to sales taxes paid out of state, see, *e. g., Halliburton, supra,* at 77 (Brennan, J., concurring); *Silas Mason, supra,* at 587; see also *Williams* v. *Vermont,* 472 U. S. 14, 21–22 (1985), we have noted that equality of treatment of interstate and intrastate activity has been the common theme among the paired (or "compensating") tax schemes that have passed constitutional muster, see, *e. g., Boston Stock Exchange, supra,* at 331–332. We have indeed never upheld a tax in the face of a substantiated charge that it provided credits for the taxpayer's payment of in-state taxes but failed to extend such credit to payment of equivalent out-of-state taxes. To the contrary, in upholding tax schemes providing credits for taxes paid in state and occasioned by the same transaction, we have often pointed to the concomitant credit provisions for taxes paid out of state as supporting our conclusion that a particular tax passed muster because it treated out-of-state and in-state taxpayers alike. See, *e. g., Itel Containers Int'l Corp.* v. *Huddleston,* 507 U. S. 60, 74 (1993); *D. H. Holmes Co.* v. *McNamara,* 486 U. S. 24, 31 (1988) ("The . . . taxing scheme is fairly apportioned, for it provides a credit against its use tax for sales taxes that have been paid in other States"); *General Trading Co.* v. *State Tax Comm'n of Iowa,* 322 U. S. 335 (1944); *Silas Mason, supra,* at 584. A general requirement of equal treatment is thus amply clear from our precedent. We express no opinion on the need for equal treatment when a credit is allowed for payment of in- or out-of-state taxes by a third party. See *Darnell* v. *Indiana,* 226 U. S. 390 (1912).

incapacity to reach the corresponding sale, it is commonly paired with a sales tax, see, *e. g., D. H. Holmes*, 486 U. S., at 31; *Boston Stock Exchange* v. *State Tax Comm'n*, 429 U. S. 318, 331–332 (1977); *Henneford* v. *Silas Mason Co.*, 300 U. S. 577 (1937), being applicable only when no sales tax has been paid or subject to a credit for any such tax paid. Since any use tax would have to comply with Commerce Clause requirements, the tax scheme could not apply differently to goods and services purchased out of state from those purchased domestically. Presumably, then, it would not apply when another State's sales tax had previously been paid, or would apply subject to credit for such payment. In either event, the Oklahoma ticket purchaser would be free from multiple taxation.

True, it is not Oklahoma that has offered to provide a credit for related taxes paid elsewhere, but in taxing sales Oklahoma may rely upon use-taxing States to do so. This is merely a practical consequence of the structure of use taxes as generally based upon the primacy of taxes on sales, in that use of goods is taxed only to the extent that their prior sale has escaped taxation. Indeed the District of Columbia and 44 of the 45 States that impose sales and use taxes permit such a credit or exemption for similar taxes paid to other States. See 2 Hellerstein & Hellerstein ¶ 18.08, p. 18–48; 1 All States Tax Guide ¶ 256 (1994). As one state court summarized the provisions in force:

"These credit provisions create a national system under which the first state of purchase or use imposes the tax. Thereafter, no other state taxes the transaction unless there has been no prior tax imposed . . . or if the tax rate of the prior taxing state is less, in which case the subsequent taxing state imposes a tax measured only by the differential rate." *KSS Transportation Corp.* v. *Baldwin*, 9 N. J. Tax 273, 285 (1987).

The case of threatened multiple taxation where a sales tax is followed by a use tax is thus distinguishable from the case of simultaneous sales taxes considered in *Goldberg*, where we were reassured to some degree by the provision of a credit in the disputed tax itself for similar taxes placed upon the taxpayer by other States. See *Goldberg*, 488 U. S., at 264 ("To the extent that other States' telecommunications taxes pose a risk of multiple taxation, the credit provision contained in the [t]ax [a]ct operates to avoid actual multiple taxation"). In that case, unlike the sales and use schemes posited for the sake of argument here, each of the competing sales taxes would presumably have laid an equal claim on the taxpayer's purse.

b

Finally, Jefferson points to the fact that in this case, unlike the telephone communication tax at issue in *Goldberg*, Oklahoma could feasibly apportion its sales tax on the basis of mileage as we required New York's gross receipts tax to do in *Central Greyhound*. Although *Goldberg* indeed noted that "[a]n apportionment formula based on mileage or some other geographic division of individual telephone calls would produce insurmountable administrative and technological barriers," 488 U. S., at 264–265, and although we agree that no comparable barriers exist here, we nonetheless reject the idea that a particular apportionment formula must be used simply because it would be possible to use it. We have never required that any particular apportionment formula or method be used, and when a State has chosen one, an objecting taxpayer has the burden to demonstrate by "'clear and cogent evidence,'" that "'the income attributed to the State is in fact out of all appropriate proportions to the business transacted . . . in that State, or has led to a grossly distorted result.'" *Container Corp.*, 463 U. S., at 170, quoting *Moorman Mfg. Co.*, 437 U. S., at 274 (internal quotation marks omitted; citations omitted). That is too much for Jefferson

to bear in this case. It fails to show that Oklahoma's tax on the sale of transportation imputes economic activity to the State of sale in any way substantially different from that imputed by the garden-variety sales tax, which we have perennially sustained, even though levied on goods that have traveled in interstate commerce to the point of sale or that will move across state lines thereafter. See, *e. g., Wardair Canada Inc.* v. *Florida Dept. of Revenue,* 477 U. S. 1 (1986); *McGoldrick* v. *Berwind-White Coal Mining Co.,* 309 U. S. 33 (1940); *State Tax Comm'n of Utah* v. *Pacific States Cast Iron Pipe Co.,* 372 U. S. 605 (1963); see also *Western Live Stock,* 303 U. S., at 259 (upholding tax where measure of the tax "include[s] the augmentation attributable to the [interstate] commerce in which [the object of the tax] is employed"); *Goldberg,* 488 U. S., at 262 (upholding tax upon the purchase of an interstate telephone call which had "many of the characteristics of a sales tax . . . [e]ven though such a retail purchase is not a purely local event since it triggers simultaneous activity in several States"). Nor does Oklahoma's tax raise any greater threat of multiple taxation than those sales taxes that have passed muster time and again. There is thus no reason to leave the line of longstanding precedent and lose the simplicity of our general rule sustaining sales taxes measured by full value, simply to carve out an exception for the subcategory of sales of interstate transportation services. We accordingly conclude that Oklahoma's tax on ticket sales for travel originating in Oklahoma is externally consistent, as reaching only the activity taking place within the taxing State, that is, the sale of the service. Cf. *id.,* at 261–262; *Container Corp., supra,* at 169–170.[7]

---

[7] JUSTICE BREYER would reject review of the tax under general sales tax principles in favor of an analogy between sales and gross receipts taxes which, in the dissent's view, are without "practical difference," *post,* at 204. Although his dissenting opinion rightly counsels against the adoption of purely formal distinctions, economic equivalence alone has similarly not been (and should not be) the touchstone of Commerce Clause jurispru-

## C

We now turn to the remaining two portions of *Complete Auto*'s test, which require that the tax must "not discriminate against interstate commerce," and must be "fairly related to the services provided by the State." 430 U. S., at 279. Oklahoma's tax meets these demands.

A State may not "impose a tax which discriminates against interstate commerce . . . by providing a direct commercial advantage to local business." *Northwestern States Portland Cement Co.* v. *Minnesota,* 358 U. S., at 458; see also *American Trucking Assns., Inc.* v. *Scheiner,* 483 U. S. 266, 269 (1987). Thus, States are barred from discriminating against foreign enterprises competing with local businesses, see, *e. g., id.,* at 286, and from discriminating against commercial activity occurring outside the taxing State, see, *e. g., Boston Stock Exchange* v. *State Tax Comm'n,* 429 U. S. 318 (1977). No argument has been made that Oklahoma dis-

---

dence. Our decisions cannot be reconciled with the view that two taxes must inevitably be equated for purposes of constitutional analysis by virtue of the fact that both will ultimately be "pass[ed] . . . along to the customer" or calculated in a similar fashion, *ibid.* Indeed, were that to be the case, we could not, for example, dismiss successive taxation of the extraction, sale, and income from the sale of coal as consistent with the Commerce Clause's prohibition against multiple taxation.

JUSTICE BREYER's opinion illuminates the difference between his view and our own in its suggestion, *post,* at 206, that our disagreement turns on differing assessments of the force of competing analogies. His analogy to *Central Greyhound* derives strength from characterizing the tax as falling on "interstate travel," *post,* at 207, or "transportation," *post,* at 202. Our analogy to prior cases on taxing sales of goods and services derives force from identifying the taxpayer in categorizing the tax and from the value of a uniform rule governing taxation on the occasion of what is generally understood as a sales transaction. The significance of the taxpayer's identity is, indeed, central to the Court's longstanding recognition of structural differences that permit successive taxation as an incident of multiple taxing jurisdictions. The decision today is only the latest example of such a recognition and brings us as close to simplicity as the conceptual distinction between sales and income taxation is likely to allow.

criminates against out-of-state enterprises, and there is no merit in the argument that the tax discriminates against interstate activity.

The argument proffered by Jefferson and *amicus* Greyhound Lines is largely a rewriting of the apportionment challenge rejected above, and our response needs no reiteration here. See Brief for Respondent 40; Brief for Greyhound Lines, Inc., as *Amicus Curiae* 20–27. Jefferson takes the additional position, however, that Oklahoma discriminates against out-of-state travel by taxing a ticket "at the full 4% rate" regardless of whether the ticket relates to "a route entirely within Oklahoma" or to travel "only 10 percent within Oklahoma." Brief for Respondent 40. In making the same point, *amicus* Greyhound invokes our decision in *Scheiner*, which struck down Pennsylvania's flat tax on all trucks traveling in and through the State as "plainly discriminatory." 483 U. S., at 286. But that case is not on point.

In *Scheiner*, we held that a flat tax on trucks for the privilege of using Pennsylvania's roads discriminated against interstate travel, by imposing a cost per mile upon out-of-state trucks far exceeding the cost per mile borne by local trucks that generally traveled more miles on Pennsylvania roads. *Ibid.* The tax here differs from the one in *Scheiner*, however, by being imposed not upon the use of the State's roads, but upon "the freedom of purchase." *McLeod* v. *J. E. Dilworth Co.*, 322 U. S., at 330. However complementary the goals of sales and use taxes may be, the taxable event for one is the sale of the service, not the buyer's enjoyment or the privilege of using Oklahoma's roads. Since Oklahoma facilitates purchases of the services equally for intrastate and interstate travelers, all buyers pay tax at the same rate on the value of their purchases. See *D. H. Holmes*, 486 U. S., at 32; cf. *Scheiner, supra*, at 291 ("[T]he amount of Pennsylvania's . . . taxes owed by a trucker does not vary directly . . . with some . . . proxy for value obtained from the State"). Thus, even if dividing Oklahoma sales taxes by

in-state miles to be traveled produces on average a higher figure when interstate trips are sold than when the sale is of a wholly domestic journey, there is no discrimination against interstate travel; miles traveled within the State simply are not a relevant proxy for the benefit conferred upon the parties to a sales transaction. As with a tax on the sale of tangible goods, the potential for interstate movement after the sale has no bearing on the reason for the sales tax. See, e. g., *Wardair Canada Inc.* v. *Florida Dept. of Revenue*, 477 U. S. 1 (1986) (upholding sales tax on airplane fuel); cf. *Commonwealth Edison Co.*, 453 U. S., at 617–619 (same for severance tax). Only Oklahoma can tax a sale of transportation to begin in that State, and it imposes the same duty on equally valued purchases regardless of whether the purchase prompts interstate or only intrastate movement. There is no discrimination against interstate commerce.

## D

Finally, the Commerce Clause demands a fair relation between a tax and the benefits conferred upon the taxpayer by the State. See *Goldberg*, 488 U. S., at 266–267; *D. H. Holmes, supra,* at 32–34; *Commonwealth Edison, supra,* at 621–629. The taxpayer argues that the tax fails this final prong because the buyer's only benefits from the taxing State occur during the portion of the journey that takes place in Oklahoma. The taxpayer misunderstands the import of this last requirement.

The fair relation prong of *Complete Auto* requires no detailed accounting of the services provided to the taxpayer on account of the activity being taxed, nor, indeed, is a State limited to offsetting the public costs created by the taxed activity. If the event is taxable, the proceeds from the tax may ordinarily be used for purposes unrelated to the taxable event. Interstate commerce may thus be made to pay its fair share of state expenses and " 'contribute to the cost of providing *all* governmental services, including those serv-

ices from which it arguably receives no direct "benefit." ' " *Goldberg, supra,* at 267, quoting *Commonwealth Edison, supra,* at 627, n. 16 (emphasis in original). The bus terminal may not catch fire during the sale, and no robbery there may be foiled while the buyer is getting his ticket, but police and fire protection, along with the usual and usually forgotten advantages conferred by the State's maintenance of a civilized society, are justifications enough for the imposition of a tax. See *Goldberg, supra,* at 267. *Complete Auto*'s fourth criterion asks only that the measure of the tax be reasonably related to the taxpayer's presence or activities in the State. See *Commonwealth Edison, supra,* at 626, 629. What we have already said shows that demand to be satisfied here. The tax falls on the sale that takes place wholly inside Oklahoma and is measured by the value of the service purchased.

## IV

Oklahoma's tax on the sale of transportation services does not contravene the Commerce Clause. The judgment of the Court of Appeals is reversed, accordingly, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring in the judgment.

I agree with the Court's conclusion that Oklahoma's sales tax does not facially discriminate against interstate commerce. See *ante,* at 198–199. That seems to me the most we can demand to certify compliance with the "negative Commerce Clause"—which is "negative" not only because it negates state regulation of commerce, but also because it does *not* appear in the Constitution. See *Amerada Hess Corp.* v. *Director, Div. of Taxation, N. J. Dept. of Treasury,* 490 U. S. 66, 80 (1989) (SCALIA, J., concurring in judgment); *Tyler Pipe Industries, Inc.* v. *Washington State Dept. of*

*Revenue,* 483 U. S. 232, 254, 259–265 (1987) (SCALIA, J., concurring in part and dissenting in part).

I would not apply the remainder of the eminently unhelpful, so-called "four-part test" of *Complete Auto Transit, Inc.* v. *Brady,* 430 U. S. 274, 279 (1977). Under the *real* Commerce Clause ("The Congress shall have Power . . . To regulate Commerce . . . among the several States," U. S. Const., Art. I, § 8), it is for Congress to make the judgment that interstate commerce must be immunized from certain sorts of nondiscriminatory state action—a judgment that may embrace (as ours ought not) such imponderables as how much "value [is] *fairly attributable* to economic activity within the taxing State," and what constitutes *"fair relation* between a tax and the benefits conferred upon the taxpayer by the State." *Ante,* at 185, 199 (emphases added). See *Tyler Pipe, supra,* at 259. I look forward to the day when *Complete Auto* will take its rightful place in Part II of the Court's opinion, among the other useless and discarded tools of our negative Commerce Clause jurisprudence.

JUSTICE BREYER, with whom JUSTICE O'CONNOR joins, dissenting.

Despite the Court's lucid and thorough discussion of the relevant law, I am unable to join its conclusion for one simple reason. Like the judges of the Court of Appeals, I believe the tax at issue here and the tax that this Court held unconstitutional in *Central Greyhound Lines, Inc.* v. *Mealey,* 334 U. S. 653 (1948), are, for all relevant purposes, identical. Both cases involve taxes imposed upon interstate bus transportation. In neither case did the State apportion the tax to avoid taxing that portion of the interstate activity performed in other States. And, I find no other distinguishing features. Hence, I would hold that the tax before us violates the Constitution for the reasons this Court set forth in *Central Greyhound.*

*Central Greyhound* considered a tax imposed by the State of New York on utilities doing business in New York—a tax called " '[e]mergency tax on the furnishing of utility services.' " *Id.*, at 664 (Murphy, J., dissenting) (quoting New York Tax Law § 186–a). That tax was equal to "two per centum" of "gross income," defined to include "receipts received . . . by reason of any sale . . . made" in New York. 334 U. S., at 664. The New York taxing authorities had applied the tax to gross receipts from sales (in New York) of bus transportation between New York City and cities in upstate New York over routes that cut across New Jersey and Pennsylvania. *Id.*, at 654. The out-of-state portion of the trips accounted for just over 40 percent of total mileage. *Id.*, at 660.

Justice Frankfurter wrote for the *Central Greyhound* Court that "it is interstate commerce which the State is seeking to reach," *id.*, at 661; that the "real question [is] whether what the State is exacting is a constitutionally fair demand . . . for that aspect of the interstate commerce to which the State bears a special relation," *ibid.*; and that by "its very nature an unapportioned gross receipts tax makes interstate transportation bear more than 'a fair share of the cost of the local government whose protection it enjoys,' " *id.*, at 663 (quoting *Freeman* v. *Hewit,* 329 U. S. 249, 253 (1946)). The Court noted:

> "If New Jersey and Pennsylvania could claim their right to make appropriately apportioned claims against that substantial part of the business of appellant to which they afford protection, we do not see how on principle and in precedent such a claim could be denied. This being so, to allow New York to impose a tax on the gross receipts for the entire mileage—on the 57.47% within New York as well as the 42.53% without—would subject interstate commerce to the unfair burden of being taxed as to portions of its revenue by States which give pro-

tection to those portions, as well as to a State which does not." 334 U. S., at 662.

The Court essentially held that the tax lacked what it would later describe as "external consistency." *Container Corp. of America* v. *Franchise Tax Bd.*, 463 U. S. 159, 169 (1983). That is to say, the New York law violated the Commerce Clause because it tried to tax significantly more than "that portion of the revenues from the interstate activity which reasonably reflects the in-state component of the activity being taxed." *Goldberg* v. *Sweet*, 488 U. S. 252, 262 (1989).

The tax before us bears an uncanny resemblance to the New York tax. The Oklahoma statute (as applied to "[t]ransportation . . . by common carriers") imposes an "excise tax" of 4% on "the *gross receipts* or gross proceeds *of each sale*" made in Oklahoma. Okla. Stat., Tit. 68, § 1354(1)(C) (Supp. 1988) (emphasis added). The New York statute imposed a 2% tax on the *"receipts* received . . . by reason *of any sale* . . . made"* in New York. See *supra*, at 202 (emphasis added). Oklahoma imposes its tax on the total value of trips of which a large portion may take place in other States. New York imposed its tax on the total value of trips of which a large portion took place in other States. New York made no effort to apportion the tax to reflect the comparative cost or value of the in-state and out-of-state portions of the trips. Neither does Oklahoma. Where, then, can one find a critical difference?

Not in the language of the two statutes, which differs only slightly. Oklahoma calls its statute an "excise tax" and "levie[s]" the tax "upon all sales" of transportation. New York called its tax an "[e]mergency tax on . . . services" and levied the tax on "'gross income,'" defined to include "'receipts . . . of any sale.'" This linguistic difference, however, is not significant. As the majority properly recognizes, purely formal differences in terminology should not make a constitutional difference. *Ante*, at 183. In both instances, the State im-

poses the tax on gross receipts as measured by sales. Both taxes, then, would seem to have the same practical effect on the, inherently interstate, bus transportation activity. If the *Central Greyhound* Court was willing to look through New York's formal labels ("[e]mergency tax on . . . services"; "gross income" tax) to the substance (a tax on gross receipts from sales), why should this Court not do the same?

The majority sees a number of reasons why the result here should be different from that in *Central Greyhound,* but I do not think any is persuasive. First, the majority points out that the New York law required a seller, the bus company, to pay the tax, whereas the Oklahoma law says that the "tax . . . shall be paid by the consumer or user to the vendor." Okla. Stat., Tit. 68, § 1361(A) (Supp. 1988). This difference leads the majority to characterize the former as a "gross receipts" tax and the latter as a constitutionally distinguishable "sales tax." This difference, however, seems more a formal, than a practical difference. The Oklahoma law makes the bus company ("the vendor") and "each principal officer . . . personally liable" for the tax, whether or not they collect it from the customer. *Ibid.* Oklahoma (as far as I can tell) has never tried to collect the tax directly from a customer. And, in any event, the statute tells the customer to pay the tax, not to the State, but "to the vendor." *Ibid.* The upshot is that, as a practical matter, in respect to both taxes, the State will calculate the tax bill by multiplying the rate times gross receipts from sales; the bus company will pay the tax bill; and, the company will pass the tax along to the customer.

Second, the majority believes that this case presents a significantly smaller likelihood than did *Central Greyhound* that the out-of-state portions of a bus trip will be taxed both "by States which give protection to those portions, as well as [by] . . . a State which does not." *Central Greyhound,* 334 U. S., at 662. There is at least a hint in the Court's opinion that this is so because the "taxable event" to which the Okla-

homa tax attaches is not the interstate transportation of passengers but the sale of a bus ticket (combined, perhaps, with transportation to the state line). See *ante*, at 190 ("The taxable event comprises agreement, payment, and delivery of some of the services in the taxing State . . ."). Thus, the majority suggests that a tax on transportation (as opposed to the sale of a bus ticket) by a different State might be "successive," *ante*, at 192, but is not "double taxation" in a constitutionally relevant way, *ante*, at 191; see *ante*, at 190 ("[N]o other State can claim to be the site of the same combination"). I concede that Oklahoma could have a tax of the kind envisioned, namely, one that would tax the bus company for the privilege of selling tickets. But, whether or not such a tax would pass constitutional muster should depend upon its practical effects. To suggest that the tax here is constitutional simply because it lends itself to recharacterizing the taxable event as a "sale" is to ignore economic reality. Because the sales tax is framed as a percentage of the ticket price, it seems clear that the activity Oklahoma intends to tax is the transportation of passengers—not some other kind of conduct (like selling tickets).

In any event, the majority itself does not seem to believe that Oklahoma is taxing something other than bus transportation; it seems to acknowledge the risk of multiple taxation. The Court creates an ingenious set of constitutionally based taxing rules in footnote 6—designed to show that any other State that imposes, say, a gross receipts tax on its share of bus ticket sales would likely have to grant a credit for the Oklahoma sales tax (unless it forced its own citizens to pay both a sales tax and a gross receipts tax). But, one might have said the same in *Central Greyhound*. Instead of enforcing its apportionment requirement, the Court could have simply said that once one State, like New York, imposes a gross receipts tax on "receipts received . . . by reason of any sale . . . made" in that State, any other State, trying to tax the gross receipts of its share of bus ticket sales, might have

to give some kind of credit. The difficulties with this approach lie in its complexity and our own inability to foresee all the ways in which other States might effectively tax their own portion of the journey now (also) taxed by Oklahoma. Under the Court's footnote rules, is not a traveler who buys a ticket in Oklahoma still threatened with a duplicative tax by a State that does *not* impose a sales tax on transportation (and thus, would not have to offer a credit for the sales tax paid in Oklahoma)? Even if that were not so, the constitutional problem would remain, namely, that Oklahoma is imposing an unapportioned tax on the portion of travel outside the State, just as did New York.

Finally, the majority finds support in *Goldberg* v. *Sweet,* 488 U. S. 252 (1989), a case in which this Court permitted Illinois to tax interstate telephone calls that originated, or terminated, in that State. However, the *Goldberg* Court was careful to distinguish "cases [dealing] with the movement of large physical objects over identifiable routes, where it was practicable to keep track of the distance actually traveled within the taxing State," *id.*, at 264, and listed *Central Greyhound* as one of those cases, 488 U. S., at 264. Telephone service, the *Goldberg* Court said, differed from movement of the kind at issue in *Central Greyhound,* in that, at least arguably, the service itself is consumed wholly within one State, or possibly two—those in which the call is charged to a service address or paid by an addressee. 488 U. S., at 263. Regardless of whether telephones and buses are more alike than different, the *Goldberg* Court did not purport to modify *Central Greyhound,* nor does the majority. In any event, the *Goldberg* Court said, the tax at issue credited taxpayers for similar taxes assessed by other States. 488 U. S., at 264.

Ultimately, I may differ with the majority simply because I assess differently the comparative force of two competing analogies. The majority finds determinative this Court's case law concerning sales taxes applied to the sale of goods,

which cases, for example, permit one State to impose a severance tax and another a sales tax on the same physical item (say, coal). In my view, however, the analogy to sales taxes is not as strong as the analogy to the tax at issue in *Central Greyhound*. After all, the tax before us is not a tax imposed upon a product that was made in a different State or was consumed in a different State or is made up of ingredients that come from a different State or has itself moved in interstate commerce. Rather, it is a tax imposed upon interstate travel itself—the very essence of interstate commerce. And, it is a fairly obvious effort to tax more than "that portion" of the "interstate activity['s]" revenue "which reasonably reflects the in-state component." *Goldberg* v. *Sweet, supra,* at 262. I would reaffirm the *Central Greyhound* principle, even if doing so requires different treatment for the inherently interstate service of interstate transportation, and denies the possibility of having a single, formal constitutional rule for all self-described "sales taxes." The Court of Appeals wrote that this "is a classic instance of an unapportioned tax" upon interstate commerce. *In re Jefferson Lines, Inc.,* 15 F. 3d 90, 93 (CA8 1994). In my view, that is right. I respectfully dissent.